**People of the State of Illinois, Plaintiff-Appellee, v. Arthur Freeman, Defendant-Appellant.**

**Gen. No. 51,050.**

First District, First Division.

December 12, 1966.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Shelvin Singer and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Joel M. Flaum and James A. Stamos, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

After a jury trial, defendant was found guilty of murder. He was sentenced to the penitentiary for 40 to 75 years. On appeal, defendant contends (1) that he was not proved guilty beyond a reasonable doubt, and (2) that the trial court (a) misstated the evidence to the jury, (b) discredited the defense attorney and deprived defendant of a fair trial, and (c) committed prejudicial errors in the conduct of the trial and in the giving and refusing of instructions.

On March 1, 1964, the body of Cola Taylor, with multiple bruises and abrasions and naked except for a brassiere and a garter belt, was found under a porch in the vicinity of South Lawndale Avenue, Chicago. The defendant, Arthur Freeman (24 years), and William Bryant (18 years) were jointly indicted for her murder. The indictment charged that they intentionally and knowingly killed Cola V. Taylor by striking her with their fists, without lawful justification, in violation of chapter 38, section 9–1 of the Illinois Revised Statutes, 1963. Subsequently, Freeman was granted a trial severance from Bryant.

At the trial of defendant Freeman, a coroner's pathologist, Dr. Eugene Tapia, testified he performed an autopsy on the body on March 1, 1964, and made both an internal and external examination. Death was caused by multiple internal injuries. There were multiple contusions and abrasions on the face and body, and three stab wounds, one in the right lobe, one in the left superior forearm, and one in the left lobar quarter above the left

245

groin. In his opinion, the various abrasions on the body were caused "by blows, by fist or stabbing in the abdomen."

On cross-examination, Dr. Tapia said, "In my opinion, death was caused by multiple internal injuries. I can say nothing more specific. Death was caused by a trauma. A trauma is a force applied to the body that causes a hemorrhage, laceration, abrasion, contusion, rupture of the viscera. In layman's language, it is a wound or injury. I feel that death was caused by a beating that could have been done by a human hand. The puncture and stab wound was unlikely to have caused death by the bleeding. She maybe would have died of infection. The stab wound hadn't lacerated any major blood vessel, just the bowels. The puncture lacerated the abdomen wall, the skin of the abdomen, of the belly. In my report, I reflect that the belly, also known as the peritoneal cavity, was filled with fifteen centimeters of liquid. That liquid was blood. That blood got in the belly from the laceration of the right peritoneal space. It is a rupture. The type of instrument that caused that rupture in my opinion is a stabbing, a kicking, or by fists. . . . That injury that I have just described, could not have been caused by a sharp instrument such as a knife. Nor could that injury have been caused by a can opener. The breaking of a blood vessel would occur before a body expired. In my opinion, I cannot tell the time of death. . . . I would include the injury in the area of the mouth would be the cause of death. The injury in the area of the mouth was a laceration. It didn't cause the death per se."

Arthur Flynn, testifying for the State, related that on February 29, 1964, at 2:00 a. m., he and the decedent were standing on the corner of Central Park and 16th Street, when two men with knives approached them. One of these men forced the decedent around the corner at knife point, while the other man knocked Flynn down and threatened him. Flynn, on parole for armed robbery,

did not report the incident to the police. The next day, Flynn was taken to a police station and questioned about the murder of Cola Taylor. He remained in custody for two or three days, during which time he picked out photographs of the two attackers. Subsequently, Flynn identified both men from a police lineup. One was Arthur Freeman. Objections to the disclosure of the identity of the second man were sustained throughout the trial.

William Bryant, also under indictment for the murder of the decedent, testified for the State and against Freeman. He stated he expected to receive consideration for his testimony. Bryant related that he and Freeman had shared an apartment at 1423 South Lawndale Avenue, and on February 29, 1964, at 3:00 a. m., while he was asleep in the apartment, he heard a commotion in the bed with him. When he woke up, "I seen Freeman having intercourse with this woman and he was beating her in the stomach with his fist. He kept repeating, 'You got me stabbed, you got me stabbed.' I got up and I went to the kitchen to get a cigarette. When I went to the kitchen I seen this fellow Otto sitting there with a knife in his hand. The man's full name is Otto Dean. I then turned around and went back into the bedroom and asked Freeman what was happening. I started pulling at his arm, and asked him what was going on. He jumped up, said, 'Man, she got me stabbed, she got me stabbed.' He had a stab wound in his chest in the right side. At the time both Freeman and the lady were naked. I think the lady was Cola Taylor. Freeman was sweating and breathing hard. He had his fist clenched. He kept looking at me, and said, 'I am going to kill the bitch.' He jumped back in bed and started beating her again. He was beating her with his fist in her stomach and side. He hit her quite a few times. As I was trying to get Freeman off her, he asked, 'Where is that money?' She said she didn't have any at first. Then she said it was in her brassiere. So then, about this time, this other

fellow, Otto, came in and ran into the bedroom with a knife in his hand. He said, 'I heard that.' He put the knife to her throat, 'Where is that money?' She said it was in the bed. Otto pushed me out of the bed, snatched the covers and sheets off the bed, started shaking them off. They didn't find any money. Freeman ran into the kitchen, and was looking into a cabinet where we keep beer bottles. . . . Well, he grabbed an opener, a can opener, and ran back into the bedroom with it. This guy, Otto, told me to sit down, and I could hear Cola screaming; I could hear Freeman hitting her as she was screaming and hollering. . . . So then Otto and I both got up and looked into the bedroom. Freeman was stomping on her with his bare foot in the head. She was on the floor. He sat down in the chair, reached in the bed, grabbed one of his shoes and started hitting her in the head with the heel of it. And then this other fellow, Otto, he said, 'Well, I am cutting out of here,' and he left. Then I went back in the room and Freeman was still beating her with the shoe. He then said he was going to let her rest for awhile and then he was going to take her home. Then Freeman laid down on the bed, and then I got into bed and I got to sleep. At this time Cola Taylor was lying on the floor at the foot of the bed."

The next morning Bryant found the decedent in the same position and ascertained that she was dead. He awakened Freeman, and "I told him his girl friend was dead. At first he didn't believe me. He went over to her and tried to get her up. He started crying, bouncing his fist on the dresser, 'Why does she have to die on me, why does she have to die on me?' I told him I was going to call the police. He said I couldn't call the police. He said since I was going to play the hero, he would rather go to jail for two murders instead of one. He also said, 'If you try to sneak off I will tell them you helped me.' "

They put the body in a closet and left. Later, they returned to the apartment and carried the body into an

alley and placed it under a porch. They put her clothing into a garbage disposal.

On cross-examination, Bryant described his activities during the evening and said that Otto was not present when he arrived home, and when he first saw Otto in the apartment he did not ask any questions of him. He did not learn the full name of Otto Dean until he met him in the County Jail. He also said that to the best of his knowledge he had never seen Cola Taylor before he saw her in the apartment. The court sustained objections to questions as to whether he was present in a lineup in the police station with Freeman, "when Arthur Flynn accused the two of you as taking her off the street at knife point."

For the defense, Otto Dean, then in the County Jail under a sentence of 40 to 60 years for rape, denied ever having been in the apartment at 1423 South Lawndale. He also denied knowing Freeman, and met Bryant for the first time while they were both in the County Jail. Lee Bertha Taylor, the 12-year-old daughter of the decedent, testified that on the night of the murder, Arthur Flynn had come over to their home and had left with her mother. Flynn had a long knife, and he told Cola Taylor to "get going." Geneva Bolden, then 17 years old, testified that she had a date with the defendant for the evening of February 28 at the Indigo Lounge. She arrived late, and they had a slight argument. She left the club at 2:15 a. m. and did not see Freeman afterwards. Leon Bell saw Freeman between 2:00 and 2:30 on Saturday morning at 15th and Lawndale. Freeman had a cut over the heart and told Bell he "got cut in a lounge." Freeman entered Dolly's Restaurant, and Bell went home. Roosevelt Williams saw Freeman in Dolly's on February 29, 1964, between the hours of 1:00 and 2:00 a. m. Freeman had been "cut," and when he left, Freeman was still there.

249

The defendant, Arthur Freeman, testified he had been in the penitentiary from 1957 to 1960 for armed robbery and again from 1961 to 1963 for statutory rape. He described at length his activities during the evening of February 28 and the early morning of February 29. He told of being attacked on the street by two unknown men. Both had knives and cut him in the chest. He went to Dolly's Restaurant, put vinegar on the cut, and met Bell. Dolly and Roosevelt Williams walked him home about 2:00 a. m., and Bryant was not there. After some time, he left the house "about 4:00 in the morning" to find Bryant to go to the hospital with him, as he was worried about his knife wound. On the street he met the decedent, whom he had seen around the neighborhood. She told him that "some chump" had "jumped on her," and he showed her his wound. She expressed concern for him, and he asked her to keep him company until Bryant came home. They arrived at the apartment at "about 3:00 a. m.," and Bryant was there.

The decedent went into the bedroom, and "Cola called me and I went in there and we had sex. Then she started complaining about her stomach, and she had my hand and she asked me, 'What about rubbing it?'" Subsequently the decedent fell into a deep sleep, and defendant unsuccessfully tried to awaken her, but she appeared groggy and fell on the floor. Defendant then applied a cold towel to the decedent in an attempt to revive her and noticed a scratch on her stomach, to which he applied salt. Because the decedent was heavy and he was weak from his wound, he let her lay on the floor, figuring the hardness of it would eventually awaken her. Later, Bryant awakened him and told him, "Your girl friend is dead." His description of the disposition of the body was similar to that of Bryant.

Defendant further testified that at a police lineup of four men, Flynn identified Bryant as the man who hit him, and after some hesitation, Flynn identified defend-

ant as "the one that had the knife." Defendant denied knowing Otto Dean—"there was no one else in the apartment but Corky (Bryant) and myself and Cola."

On cross-examination, defendant stated that the decedent had not told him that she had been stabbed; that she had never been to his apartment before; and that he never had intercourse with her prior to the night of her death. He denied having ever struck her, although he saw her fall and strike something and hit the floor very hard. He also denied that he was present at the time Bryant gave a written statement to the police.

Another witness offered on behalf of defendant was Dr. Harold Wagner, a pathologist who had been in the coroner's office for nine years. After informing the witness, "I have a hypothetical question for you," defendant's counsel asked the State's Attorney to stipulate "to the pathological report and protocol that contains the name of Dr. Tapia who conducted the examination and testified here yesterday." At this point, a discussion was held in the chambers and out of the presence of the jury. On inquiry by the court, counsel for defendant stated he had not framed his hypothetical question and intended to use the protocol of the doctor who conducted the examination "as the basis for my hypothetical question," and "I'll ask the man whether or not he has an opinion . . . as to these facts, as to the cause of death, and I will ask him to state his opinion." The court stated, "It's all based on him never having seen this body. In other words, he's going to read another man's report and he's going to give medical opinions as to the cause of death of this person, is that right?" Defendant's counsel replied that the report of the examining doctor and his testimony did not jibe. In the testimony and the protocol there was an inconsistency, "so the doctor who testified yesterday could have made an error in testimony, with respect to his findings, and we are asking this man to examine the report, the recorded findings, to determine,

251

from the interpretation of these facts, what his medical opinion is as to the cause of her death." As a basis for objecting, the State pointed out that if there was any discrepancy between the testimony and the written report, the pathologist could have been impeached at the time he testified.

After extended discussion between court and counsel, the court denied any hypothetical questions based on the protocol or on the testimony of Dr. Tapia and said, "I don't think we need an interpretation from this witness as to Dr. Tapia's testimony. I'm not going to permit this doctor to comment on Dr. Tapia's questions and answers."

The discussion, still out of the presence of the jury, then proceeded to the form of an offer of proof for the record. After outlining the facts proposed to be included in several hypothetical questions, defendant's counsel continued that Dr. Wagner would say that "it's his opinion that the cause of this hemorrhage leading to the blood filling the belly would be from the puncture in the abdominal area which, again, punctured the bowel and the blood vessels, in and about that region, which would be the cause of death; and that the cause of death under no circumstances could have been brought about by the beating that this body sustained." This concluded the offer of proof, and the court denied it.

On rebuttal, Bryant testified that he gave a written statement to the police, and that Freeman was present when Bryant signed it. He related a conversation with Otto Dean while in jail—"I asked Otto if he knew the nature of the charge for which I was being held, and he said, 'I do.' And I asked him did he realize I was being held in his place and he didn't respond. . . . And I told him that . . . I had intended in testifying in Freeman's case and I asked him was he going to testify and was he going to tell the truth about the matter. And he told me at that time that he was already pending trial on a

252

similar case and that he couldn't afford to exonerate me at all and that he and Freeman wanted to go to the streets just as bad as I did." He further said that he hadn't seen Otto Dean from February, 1964, to February, 1965.

William Boyd, also a State rebuttal witness, testified that he was a police officer present at the interrogation of Bryant on March 2, 1964. Detective Brodersen did the questioning, and "Arthur Freeman was present at all times during the taking of this statement." He identified People's Exhibit 5 for identification as the statement and said that it accurately reflected the questions asked and the answers given at that time.

Defense surrebuttal witnesses included Wesley Brodersen, a police officer, who stated that Bryant gave him a description of a man whose first name was "Otto," and Bryant said he didn't know his last name. He further said that Freeman knew a man named "Otto," but did not say that Otto was in his room on the night in question. Defendant denied telling any police officer that he knew anyone by the name of "Otto."

It is defendant's theory and primary defense that Flynn killed Cola Taylor. Defendant concedes that he was with Cola Taylor in the morning hours of February 29, 1964, and that he had intercourse with her in the bed he shared with Bryant; also, that decedent died in his apartment, and that he and Bryant disposed of the body, but asserts that he did not "beat Cola Taylor to death."

Defendant argues that as Flynn forced decedent to leave her home at knife point, it is reasonable to infer that Flynn inflicted the fatal wounds, and that "with blood seeping from her veins, Mrs. Taylor was ambulatory enough to meet Freeman, go to his apartment, to finally expire there an hour or so after the infliction of the fatal wounds." Further, that Flynn, after learning Freeman and Bryant were also suspects, fabricated "what on the surface is a plausible story, implicating Bryant and Freeman and absolving himself."

253

██ Defendant's theory was fully argued to the jury by both sides during final argument, and the evidence fully supports the verdict of the jury, which found defendant "guilty of murder in manner and form as charged in the indictment." We find no merit to the contention of defendant that the State failed to prove him guilty beyond a reasonable doubt. Also, we find no merit to defendant's contention that the evidence shows that the death of Cola Taylor was the result of a stabbing and not a beating, and thus a material variation from the allegation of the indictment.

We consider next the important and serious issue of whether defendant received a fair and impartial trial and if prejudicial trial errors were committed. As to the cause of death, defendant contends that the testimony of Dr. Tapia was uncertain and ambiguous, and defendant was thwarted by the court and the State from obtaining a clear opinion as to the ultimate cause of death; that the court should have permitted Dr. Wagner "to testify as to his opinion regarding the cause of death based upon a hypothetical question." Defendant argues that there is no requirement that a medical expert responding to a hypothetical question make his own examination. City of Decatur v. Fisher, 63 Ill 241 (1872); Chicago Union Traction Co. v. Roberts, 229 Ill 481, 82 NE 401 (1907).

█ The State contends that the protocol was never in evidence, and the opinion of an expert is to be allowed only if it is based on and supported by facts in evidence. We agree. Kanne v. Metropolitan Life Ins. Co., 310 Ill App 524, 530, 34 NE2d 732 (1941).

██ Defendant's offer of proof, made out of the presence of the jury, as to the hypothetical question to be asked his expert witness, did not include all of the findings of the internal and external examination of the body as related by Dr. Tapia. As there was no conflict as to

254

the examination findings of Dr. Tapia, this entire testimony should have been included in defendant's proposed hypothetical question. "A hypothetical question must not ignore material facts which affect the opinion." (Sanitary Dist. of Chicago v. Industrial Commission, 343 Ill 236, 243, 175 NE 372 (1931).) The protocol was not in evidence, so any hypothetical question based on it would have been improper, and the offer of proof, based on the testimony of Dr. Tapia, did not include all of the material findings. The court's ultimate ruling here was correct.

■■ Defendant further contends that the court unduly limited cross-examination of the State's pathologist and argues that great latitude should be given in the cross-examination of a medical expert. (Muscarello v. Peterson, 20 Ill2d 548, 554, 170 NE2d 564 (1960).) The record shows that although the court sustained numerous objections to defendant's questions, a reasonable degree of latitude was afforded in the cross-examination of this witness. Defendant had full opportunity to explore his theory that the stab wounds caused the death. In sustaining objections to questions which the court considered repetitious, the court repeatedly gave reasons for its rulings, which were not complimentary to defendant's counsel, and also repeated at length the court's recollection of the testimony sought to be again explored. We find no prejudicial error here, even though the remarks of the court indicate impatience.

Defendant also complains that the cross-examination of Flynn and of Bryant was unduly restricted and suppressed evidence favorable to defendant. As to Flynn, the trial court sustained objections to defendant's questions as to the identity of the second man present when defendant took Cola Taylor away at knife point. Defendant argues that if Bryant were telling the truth in his account of what occurred at the apartment, Otto Dean

<br><br>

would have been identified as the one who assaulted Flynn. If Bryant was identified as the second man, this would have discredited Bryant's testimony. The State argues that the identification of the second man was not material to the guilt of punishment of the defendant, and the identification would have been superfluous. Also, no essential fact was concealed from the jury—defendant admits Bryant was present at the apartment when decedent died, and he does not accuse Bryant of the crime.

As to Bryant, the court sustained objections to questions as to what happened at the police lineup, which defendant asserts were designed to test the credibility of Bryant and Flynn and to show that their testimony was contradictory. The State argues that defendant's cross-examination of Bryant went beyond the scope of the direct examination, as there was nothing in the direct examination of Bryant concerning the abduction of the decedent or of his participation in the police lineup. The State asserts that the inquiry raised collateral and immaterial issues and would have only served to confuse the jury and, therefore, the court did not abuse its discretion in sustaining the State's objections.

██ ██ While we believe that considerable latitude should have been given defendant in the cross-examination of these witnesses, it was largely a matter of the trial court's discretion, and we find no prejudicial error here. The question of whether the second man was Otto Dean or Bryant at the time the decedent left Flynn with defendant was not material to defendant's defense. The defendant was present at the lineup at the police station, and his version of what took place was before the jury. The questions in issue were designed to test the credibility of these witnesses, and as the background of both Flynn and Bryant was fully exposed to the jury, it was a matter for the sound discretion of the court. We find no error here.

Defendant next contends that "the court, in the presence of the jury, misstated the evidence, indicated disapproval of the defense attorneys, discredited the defense attorney and the defense, invaded the province of the jury, and deprived the defendant of his defense and a fair trial."

 The record, as stated by defendant, shows that "much of the testimony was of a technical nature, and the trial was a relatively long and hotly contested affair." We agree that "it is the duty of a court to see that every defendant guilty or innocent, receives a fair trial," and that "a court must not directly or indirectly convey its opinion to a jury." However, it is equally the duty of the court to see that the State also receives a fair trial. Although this record indicates some irritation on the part of the court with counsel for defendant, we have noted a number of instances which indicate provocation by defense counsel. The remarks made in People v. Smith, 63 Ill App2d 369, 211 NE2d 456 (1965), are pertinent here (p 377):

> "While the trial judge must be cautious to conceal his impressions or feelings, . . . it would be a dangerous precedent to permit counsel to take advantage of statements of the trial court which were either invited or provoked by such counsel. . . . We do not believe that the court's comments were such as to convey to the jury a feeling of hostility or prejudice toward the defendant and thereby deny to him a fair trial, or to render unavailing the subsequent instruction that the court had not expressed an opinion on the facts of the case or the credibility of the witnesses."

 Defendant further asserts that it was prejudicial error on rebuttal to permit Bryant to identify the written statement made by him at the police station on March 2,

1964, and to read from the document the names of the persons present. This questioning was to refute the testimony of defendant that he was not present at the time Bryant gave his statement. Defendant did not object to the questioning, and the document was not offered in evidence. While we do not think the method used was necessary to achieve the impeachment intended, we find no prejudicial error.

Finally, we consider defendant's contention that the court committed reversible error in the giving and refusing of instructions. Specifically, defendant argues that the court should have given the jury instructions defining involuntary manslaughter; that the court should have given the instruction tendered by the defense regarding the accomplice witness; and that it was error to give an instruction defining circumstantial evidence.

 We have examined the instructions given and refused and find the jury was adequately instructed on the issues presented and the evidence offered by both sides. A manslaughter instruction was not proper here. The testimony of Bryant, accepted by the jury, evidenced malicious conduct on behalf of defendant, actuated by wanton and reckless disregard for human life. (People v. Tillman, 26 Ill2d 552, 187 NE2d 731 (1963).) The accomplice witness instruction given by the court fully and fairly instructed the jury as to the character of this type of testimony and was sufficient for the purpose intended. The inclusion of "the law demands a conviction" in the instruction given on circumstantial evidence has been criticized (People v. Ciucci, 8 Ill2d 619, 628, 137 NE2d 40 (1956)), and has been found proper (People v. Guido, 321 Ill 397, 414, 415, 152 NE 149 (1926)). We find no error here.

 In conclusion, this record calls for the repetition of the statement, "the object of review by this court is not to determine whether the record is completely free

of error but to ascertain whether upon the trial there has been such error as might prejudice the rights of a party." (Moore & Co. v. Champaign Nat. Bank, 13 Ill App2d 232, 246, 141 NE2d 97 (1957).) The trial court was called upon to rule upon numerous objections made by both sides on technical questions, with an unusual array of witnesses, and it is the opinion of this court that both sides received a fair and impartial trial. No material evidence was kept from the jury, and it was fully informed as to the character of all of the witnesses and of facts which might have affected their credibility.

For the reasons given, the judgment of the Criminal Division of the Circuit Court of Cook County is affirmed.

Affirmed.

BURMAN and KLUCZYNSKI, JJ., concur.