NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in
the limited circumstances
allowed under Rule

2022 IL App (4th) 190873-U

NO. 4-19-0873

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 9, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| SHELLEY MURPHY, | ) | No. 18CF454 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, concluding (1) the evidence was sufficient to prove beyond a reasonable doubt that defendant knew her conduct created a strong probability of death or great bodily harm as required to sustain a first degree murder conviction and (2) the trial court did not abuse its discretion in sentencing defendant to 50 years' imprisonment.

¶ 2     In August 2018, a grand jury charged defendant, Shelley Murphy, with two counts of first degree murder. In October 2019, a jury found defendant guilty of first degree murder and found the State proved the victim was a person 60 years of age or older. In December 2019, the trial court sentenced defendant to 50 years' imprisonment.

¶ 3     Defendant appeals, arguing (1) this court should reduce defendant's conviction to involuntary manslaughter because the State failed to prove beyond a reasonable doubt that she acted with the mental state required to sustain a first degree murder conviction and (2) this court should reduce defendant's sentence where the record demonstrates she is not so irredeemable

that a judge could reasonably condemn her to die in prison. For the following reasons, we affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5        In August 2018, a grand jury charged defendant with (1) first degree murder, alleging defendant, without lawful justification and with the intent to kill or do great bodily harm, performed the acts which caused the death of Daye Lynn Murphy (720 ILCS 5/9-1(a)(1) (West 2018)) (count I) and (2) first degree murder, alleging defendant, without lawful justification and knowing her acts created a strong probability of death or great bodily harm, performed the acts which caused the death of Daye Lynn (720 ILCS 5/9-1(a)(2) (West 2018)) (count II).

¶ 6        Defendant and Daye Lynn were married in April 2018. On July 22, 2018, defendant and Daye Lynn got into a fight, and defendant hit Daye Lynn twice in the side of the head with her bare fist. Daye Lynn died on July 25, 2018.

¶ 7                                    A. Jury Trial

¶ 8        In October 2019, the matter proceeded to trial, where the jury heard the following evidence. We summarize only the evidence necessary for the resolution of this appeal.

¶ 9                                1. *The State's Evidence*

¶ 10       Christopher Turner, a deputy with the Vermilion County Sheriff's Department, testified that, on July 25, 2018, at approximately 6:30 p.m., he responded to 501 Vance Lane in Danville, Illinois, for a dispatch regarding an unresponsive female. Turner arrived at the scene and was met by a woman, later identified as defendant, who advised him to hurry and led him to the south bedroom of the residence. Arriving in the south bedroom, Turner observed defendant's

- 2 -

sister, Danielle Taylor, performing chest compressions on a nude female, Daye Lynn, on the floor. Turner advised Taylor to continue and went outside to flag down the ambulance.

¶ 11        Jana Hanner, an emergency medical technician (EMT), testified that, on July 25, 2018, she responded to a call at 501 Vance Lane in Danville, Illinois. When Hanner arrived, Daye Lynn had no pulse and was not breathing. Hanner asked about Daye Lynn's medical history, drug or alcohol use, and the last time she seemed normal. Hanner learned Daye Lynn had a heart stent and took Metformin. Defendant told Hanner that Daye Lynn had not used drugs or alcohol, had answered questions the night before by shaking her head yes or no, and had lain on the floor since Sunday July 22, 2018. After approximately 10 minutes trying to resuscitate Daye Lynn, Hanner called the doctor to get orders to terminate in the field, and Daye Lynn was transferred to the coroner.

¶ 12        After the EMTs finished, Turner interviewed defendant in the residence. According to Turner, defendant said she and Daye Lynn had been drinking heavily on July 22, 2018, and got into a fistfight. After the fistfight, Daye Lynn had lain down in the south bedroom and had not gotten up since. Turner asked if Daye Lynn had medical problems, and defendant reported she had a heart stent, suffered from bipolar disorder, and took numerous medications. Turner observed bruising under defendant's left eye and on her arms.

¶ 13        Turner asked whether defendant interacted with Daye Lynn between July 22 and July 25. Turner testified,

>        "[Defendant] advised that Daye Lynn was unresponsive on the
>        24th of July. Daye Lynn had defecated on herself while lying on
>        the floor. The defendant advised that she removed her clothes and
>        got a wash rag and some water and cleaned her off. The defendant

also advised that on that same day she asked Daye Lynn if she was all right. The defendant advised that she—Daye Lynn shook her head up and down in an affirmative manner. The defendant stated that she asked Daye Lynn if she needed to go to the hospital. She advised that Daye Lynn shook her head side to side in a negative manner."

Defendant told Turner that Daye Lynn had not consumed food or liquids since July 22. According to Turner, defendant tried to give Daye Lynn ice chips to keep her hydrated. Turner "observe[d] bruising under both Daye Lynn's right and left eye, as well as an area on her forehead that appeared swollen." Turner testified, "I asked the defendant about the area that was swollen on her forehead and the defendant advised that that injury occurred weeks ago."

¶ 14 Captain Michael Hartshorn, the chief investigator for the Vermilion County Sheriff's Department, arrived at the scene at approximately 7:45 p.m. Hartshorn entered the south bedroom, which smelled strongly of urine. Hartshorn began photographing the residence and noticed spots of a red blood-like substance on the wall of the hallway between the kitchen and the north bedroom. Defendant informed Hartshorn she had a physical altercation with Daye Lynn in the north bedroom and the living room. Hartshorn identified several photographs of defendant depicting bruising under her left eye and on her arms. Hartshorn also identified a photograph of defendant's hand with a round wound.

¶ 15 On July 26, 2018, crime scene investigator Tim Lemasters inspected the residence and collected samples of red blood-like stains. Three of the samples were submitted for testing, and an Illinois State Police forensic scientist testified blood was indicated on all three samples. Dana Pitchford, an Illinois State Police forensic scientist specializing in deoxyribonucleic acid

(DNA) analysis, testified she compared the DNA from the three samples with Daye Lynn's known DNA profile. Pitchford determined Daye Lynn could not be excluded as being a contributor to the samples. Also on July 26, 2018, investigator Brad Norton observed defendant filling out paperwork with her left hand.

¶ 16      Dr. Scott Denton, a forensic pathologist with the McLean County Coroner's Office, testified that, on July 26, 2018, he performed an autopsy on Daye Lynn. According to Denton, Daye Lynn was five feet, eight inches tall, weighed 175 pounds, and had external evidence of injury. Denton observed bruising on Daye Lynn's right and left cheeks from blunt trauma. The bruise on her right cheek showed signs of yellowing and swelling, indicating the bruising happened two or three days before her death. Denton testified the bruises on her cheeks were caused by two separate impacts and not a fall because her nose was uninjured. According to Denton, the bruising on Daye Lynn's neck was also inconsistent with a fall because her chin was uninjured. Daye Lynn also had bruising on her torso that was consistent with blunt force trauma and occurred within one to three days of her death. Additional bruising consistent with blunt force trauma was present on Daye Lynn's left arm, on her hip, near her groin, and on her back. Denton observed bruises on her knees consistent with someone collapsing to their knees. There was also internal bruising on her neck, liver, and ribs consistent with blunt trauma.

¶ 17      Denton testified he examined Daye Lynn's hands and arms for defensive wounds. The back of Daye Lynn's right hand had a red abraded contusion and a bruise "consistent with a defensive injury, holding someone's hand up as they are being struck on the right side of their head." The back of her left hand also had defensive wounds.

¶ 18      Denton testified that the tissue over Daye Lynn's skull had bruising consistent with knuckle marks and the pattern suggested she had been struck twice on the right side of her

head. Denton removed the top of Daye Lynn's skull and "saw evidence of something called a subdural hematoma or a blood clot that had formed directly on the right side beneath those bruises over her brain and it was pushing her brain sideways and then downwards, which would have caused her death." According to Denton, the force of a blunt trauma to the side of Daye Lynn's head transmitted through the skull and tore the veins that attach the dura to the surface of the brain. The torn blood vessels leaked blood into the space formed the 140-gram blood clot or subdural hematoma. Denton opined "moderate to severe" force caused the injury.

¶ 19        Denton ruled out a fall as the cause of Daye Lynn's injury. First, the pattern bruising indicated knuckles rather than falling on the floor. Second, when someone falls "the brain and the head will fall together, and as the head stops, the brain will impact the skull, cause that bleeding, but then it rebounds and tears, so you get bleeding on the opposite side." Daye Lynn had no opposite side bleeding. Denton testified the blood clot was not liquid but was "gelatinous in consistency, which again is consistent with that two to three, two to four day area."

¶ 20        Denton testified that symptoms of a subdural hematoma include a feeling of pressure or a headache, nausea, vomiting, loss of consciousness, and a gradual decrease in breathing until breathing stopped. Snoring respirations—slow, deep breathing caused by brain swelling due to trauma, drug use, lack of oxygen, or a subdural hematoma—are commonly seen before death. Denton could not say when Daye Lynn would have lost consciousness, but snoring respirations indicated a loss of consciousness.

¶ 21        According to the toxicology report, Daye Lynn had a "lower amount" of methamphetamine in her system. No alcohol was detected in the toxicology report, but Denton testified that did not mean Daye Lynn had not been drinking prior to her head injury. According

to Denton, "as your heart is still pumping and your liver is still working, you will metabolize the alcohol even as you are in this process of sustaining this head injury and dying from it." Denton acknowledged Daye Lynn was prescribed a blood thinner, but it did not show up in the toxicology report. Denton opined Daye Lynn's "cause of death is that subdural hematoma over the right side of her brain and it was due to a physical altercation." There was no other competing or contributory cause of death.

¶ 22                                    2. *Defendant's Evidence*

¶ 23          Danielle Taylor testified that, in the early evening of July 22, 2018, she and a friend went to the home at 501 Vance Lane in Danville, where Danielle's mother lived with defendant and Daye Lynn. Danielle's friend said something to her mother's dog and Daye Lynn got upset because she thought the friend was talking to her. Danielle asked Daye Lynn to go down the hall, so Daye Lynn left the room. Danielle noticed defendant and Daye Lynn "had been drinking a little bit." Danielle spoke with her mother a little longer before leaving.

¶ 24          At approximately 5:30 or 6 p.m. on Wednesday July 25, 2018, Danielle returned to her mother's house to look for her sunglasses. Defendant answered the door and seemed a little bit upset and "[n]ot her normal self." Danielle had a conversation with defendant and then went into the south bedroom where Daye Lynn was. Danielle observed Daye Lynn "laying on the floor, asleep on the floor, snoring." Daye Lynn was on her stomach under a sheet with no clothing on. Danielle called the emergency room and spoke with a nurse. When Danielle returned to the south bedroom, Daye Lynn was no longer breathing and had no pulse. Danielle called 911, and she and defendant began performing cardiopulmonary resuscitation (CPR) on Daye Lynn.

¶ 25    Danielle explained she called the emergency room instead of 911 to ask if it was normal for someone "to drink that heavily and sleep that many days." The emergency room nurse told Danielle to call 911. Danielle did not recall whether defendant took the phone and called their mother before Danielle called 911, but she agreed defendant might have called their mother. According to Danielle, defendant told her she got into an altercation with Daye Lynn on Sunday and pushed Daye Lynn off of her. Danielle testified, "I do believe [defendant] was acting in self-defense. She outweighed my sister by 50 pounds."

¶ 26    Defendant testified that, in the days leading up to July 22, 2018, she and Daye Lynn were using methamphetamine. On Sunday, July 22, 2018, defendant went to the liquor store with her mother. According to defendant, she, her mother, and Daye Lynn were drinking alcohol throughout the day. Defendant testified she drank "three or four quarter pints," and Daye Lynn drank "about ten of them maybe. Five or more." Defendant was in bed with Daye Lynn "kind of arguing," when defendant heard her sister's voice. Defendant went to talk with her sister.

¶ 27    After Danielle left, defendant went back to the bedroom she shared with Daye Lynn and got back in bed. Daye Lynn "kept going on and on" about disliking defendant's family. Defendant testified,

> "She was just, like, arguing and I just turned my back to her and she was hitting me in the back of the head and I kept telling her to quit and I rolled over and told her to quit. I mean, we had to figure out something. And she was on top of me, the next thing I know she is on top of me and I am f*** trying to push her off of me and she's holding my hands down and I'm f*** hitting her and pushing

- 8 -

her off of me and I was trying—she kept grabbing my hands and I

pushed her out and she bit my hand, so I hit her."

After she got Daye Lynn off of her, defendant ran out of the bedroom. Defendant testified she weighed 140 pounds and was five foot one or five foot two. After defendant left the room, Daye Lynn "hollered" for her, so she returned to the bedroom. According to defendant, Daye Lynn "said she didn't feel good or she was sick[.]" Defendant testified, "I said, 'So am I.' I said, 'I'm going to go lay down.' "

¶ 28    Defendant woke up at some point in the night and reached across the bed to see if Daye Lynn was there. Daye Lynn was not in the bed, so defendant looked for her in the bathroom, living room, and kitchen. Defendant found Daye Lynn asleep and snoring in the south bedroom. Defendant went back to bed and woke up Monday morning at 10 or 11 a.m. Defendant checked on Daye Lynn, who was still snoring. Defendant went back to bed and awoke again at approximately 5 p.m. Defendant then checked the bathroom and observed Daye Lynn's pills and pill bottles "all over the dryer." Defendant testified she thought about calling 911 but decided not to after speaking with her mother.

¶ 29    On Tuesday, defendant woke up at approximately 10 a.m. and checked on Daye Lynn, who was asleep and snoring. Defendant attempted to wake Daye Lynn up, "and she just grumbled like she didn't want [defendant] to wake her up." Defendant went to a friend's house because she wanted to call 911 or her mother, but her friend did not have a working phone. Defendant then went to the Black Bear Bar and Grill and called her mother. Tuesday afternoon, defendant tried pouring water on Daye Lynn's head to wake her up. According to defendant, Daye Lynn said, "Hey, brrr." Defendant testified that Daye Lynn had defecated on herself, so defendant cleaned her up.

¶ 30        Tuesday night, defendant took "a half of a Seroquel because [she] just was freaking out." Defendant slept for most of the day Wednesday and awoke when her sister arrived that evening. According to defendant, Daye Lynn was still sleeping and snoring. Defendant's sister called the hospital then an ambulance. Defendant testified Daye Lynn stopped breathing and defendant and Danielle began performing CPR. Defendant acknowledged she did not call 911 on Monday, Tuesday, or Wednesday, but she wished she had. According to defendant, she did not call 911 because she was afraid Daye Lynn would be put in a psychiatric ward or have her medications taken away.

¶ 31        On cross-examination, defendant agreed she was upset because she loved Daye Lynn and wished she was still alive. The State asked defendant whether she called her mother approximately a week before the trial, and defendant testified she did not recall. Defendant denied or did not recall calling Daye Lynn "a f*** retard," "a f*** dumb a***," "f*** stupid," or a "f*** moron." Defendant testified she might have said, "God rest her soul, but, God, I wish I never would have met her."

¶ 32        Defendant testified Daye Lynn was taller and stronger but also 11 years older. According to defendant, Daye Lynn had some health problems but she walked a lot and was really healthy. Daye Lynn did not get up to eat, drink, or use the bathroom for two days. Defendant gave Daye Lynn ice chips on Tuesday. Defendant acknowledged that she was in the best position to make a decision about Daye Lynn's medical condition. According to defendant, Daye Lynn "took five Ambien, 400 milligram Seroquel," and defendant chose to let Daye Lynn sleep.

¶ 33        Defendant agreed she was interviewed by police on July 25, 2018. According to defendant, she was intoxicated during the July 25, 2018, interview and she had forgotten about

the fight with Daye Lynn. On July 27, 2018, police interviewed defendant again, and the State asked if she denied hitting Daye Lynn in the head. Defendant stated she did not know where she hit Daye Lynn because it was dark.

¶ 34                                    3. *Rebuttal*

¶ 35            In rebuttal, investigator Brad Norton testified he interviewed Danielle on July 25, 2018. Norton testified that, during the interview, Danielle said she called the emergency room and then let defendant call their mother before she finally called 911. Norton testified Danielle did not tell him defendant acted in self-defense. The State played a clip from the recorded interview with Danielle. In the video, Danielle told Norton she called the hospital and, before Danielle called 911, defendant called their mother.

¶ 36            Norton testified he interviewed defendant on July 25 and 27, 2018. According to Norton, defendant was not intoxicated during either interview. The State played clips from defendant's recorded interviews. In one clip, defendant told Norton she and Daye Lynn argued. When Norton asked if the altercation was physical, defendant responded, "Not that I recall." In another clip, defendant denied doing anything to Daye Lynn. In the third clip, defendant said "it wasn't that physical." In the final clip, Norton informed defendant that Daye Lynn sustained a hard hit to her head that caused a brain bleed and defendant denied hitting Daye Lynn in the head.

¶ 37            The State also played a recording of defendant's phone call with her mother the week before trial. During the call, defendant called Daye Lynn "f*** stupid," a "f*** dumb a***," a "f*** retard," and a "f*** moron." Defendant also stated, "God rest her soul, but, God, I wish I would have never met her."

¶ 38                                    4. *Verdict*

- 11 -

¶ 39    At defense counsel's request, the trial court instructed the jury on second-degree murder and involuntary manslaughter, as well as first degree murder. The jury found defendant guilty of first degree murder. The jury found the State proved Daye Lynn was a person 60 years of age or older. The jury found the allegation that defendant committed the offense of involuntary manslaughter against a family or household member was not proven.

¶ 40                          B. Sentencing

¶ 41    Defendant's presentence investigation report (PSI) indicated she was 49 years old at the time of the offense. Defendant's criminal history included five felony convictions, including two convictions for operating a vehicle while intoxicated, a conviction for operating a vehicle after suspension as a habitual traffic violator, and a conviction for operating a vehicle "during Habitual Traffic Violator" in Indiana. Defendant's fifth felony conviction was for aggravated driving under the influence in Edgar County, Illinois. In 2014, defendant was diagnosed with anxiety and depression and was prescribed Seroquel. At the time of sentencing, she was not receiving counseling, seeing a doctor, or taking medications.

¶ 42    Defendant had a daughter who was 33 years old at the time of sentencing. According to the PSI, defendant completed tenth grade at Ben Davis High School in Indianapolis, Indiana. In 1999, defendant earned a GED from Danville Area Community College. From 2012 to 2016, defendant worked at Flex-N-Gate in Danville, Illinois. From March 2018 to May 2018, defendant worked at Simonton Windows in Paris, Illinois.

¶ 43    Defendant's first regular use of alcohol was at the age of 21, and "[s]he reported first becoming intoxicated at the age of 23 and from 1996 to 2000 drinking beer and tequila to intoxication most of the time." Defendant reported she first used methamphetamine in 2018 and would binge use with her wife. According to defendant, she last used marijuana in 2009.

- 12 -

Defendant felt she had a problem with alcohol abuse but not with drugs. Defendant reported "she ha[d] completed and been discharged successfully from Wabash Valley treatment twice from 1996 to 2000."

¶ 44        In December 2019, the matter proceeded to a sentencing hearing. Five members of Daye Lynn's family read victim impact statements. The State noted defendant was eligible for an extended term of 20 to 100 years' imprisonment based on the victim's age. The State emphasized defendant's criminal history and the fact that she committed the offense while on probation. The State argued a sentence of 50 to 55 years' imprisonment was appropriate. Defense counsel recommended a minimum sentence of 20 years' imprisonment.

¶ 45        The trial court noted defendant's "total lack of empathy and caring" for Daye Lynn after the altercation and stated it found it "unfathomable that you would treat a fellow human being—if nothing else, a fellow human being—like that." The court stated there were no factors in mitigation that met the situation. In aggravation, the court noted defendant's history of criminal activity, the need to deter others from committing the same offense, the victim was 60 years of age or older, and defendant was on probation at the time she committed the offense. The court stated it considered the nature and circumstances of the offense and the history, character, and condition of defendant and sentenced defendant to 50 years' imprisonment with a three-year term of mandatory supervised release.

¶ 46        This appeal followed.

¶ 47                              II. ANALYSIS

¶ 48        On appeal, defendant argues (1) this court should reduce defendant's conviction to involuntary manslaughter because the State failed to prove beyond a reasonable doubt that she acted with the mental state required to sustain a first degree murder conviction and (2) this court

should reduce defendant's sentence where the record demonstrates she is not so irredeemable that a judge could reasonably condemn her to die in prison.

¶ 49                           A. Sufficiency of the Evidence

¶ 50            When determining whether sufficient evidence supported a conviction, "our function is not to retry the defendant." *People v. Sutherland*, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006). Instead, we must resolve " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We allow all reasonable inferences in the light most favorable to the State. *People v. Beauchamp*, 241 Ill. 2d 1, 8, 944 N.E.2d 319, 323 (2011). It is the province of the finder of fact to determine the credibility of a witness and the finding is entitled to great weight. *People v. Smith*, 185 Ill. 2d 532, 542, 708 N.E.2d 365, 370 (1999). We reverse only where the evidence is so unsatisfactory, unreasonable, or improbable that it raises a reasonable doubt as to the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004).

¶ 51            A defendant commits first degree murder when her acts cause another's death and she (1) intends to kill or do great bodily harm or knows her acts will cause death, (2) knows her acts create a strong probability of death or great bodily harm, or (3) attempts or commits a forcible felony other than second-degree murder. 720 ILCS 5/9-1(a)(1)-(3) (West 2018). "Accordingly, a defendant may commit first degree murder in three different ways: intentionally, knowingly, or felony murder." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26, 123 N.E.3d 100. At issue in this case is whether defendant knowingly committed first degree murder. "An individual acts with knowledge when he is consciously aware that his conduct is practically

certain to cause a particular result." *Id.* Knowledge is generally established by circumstantial evidence. *Id.*

¶ 52 "Involuntary manslaughter requires less culpability than first degree murder." *People v. Lengyel*, 2015 IL App (1st) 131022, ¶ 44, 38 N.E.3d 171. A person commits involuntary manslaughter when a person's actions "are likely to cause death or great bodily harm to some individual, and he [or she] performs them recklessly." 720 ILCS 5/9-3(a) (West 2018). "In general, a defendant acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur." *People v. DiVincenzo*, 183 Ill. 2d 239, 250, 700 N.E.2d 981, 987 (1998). Generally, the question of whether a defendant acted intentionally, knowingly, or merely recklessly is for the trier of fact. *People v. Nibbe*, 2016 IL App (4th) 140363, ¶ 26, 48 N.E.3d 835.

¶ 53 Illinois courts have recognized a long-standing principle that death is not usually contemplated as a natural consequence of blows from bare fists. *People v. Jones*, 404 Ill. App. 3d 734, 748, 936 N.E.2d 1160, 1173 (2010). In *People v. Crenshaw*, 298 Ill. 412, 414, 131 N.E. 576, 576-77 (1921), the defendant took the victim by the arm, turned the victim partially around, and told him that he would kill him for two cents. The defendant struck the victim on the side of his face or head with a clenched fist and knocked the victim down. *Id.* The victim died shortly thereafter, and the cause of death "was attributable only to the blow struck by defendant." *Id.* The supreme court reversed the defendant's murder conviction, concluding "[t]he striking of a blow with the fist on the side of the face or head is not likely to be attended with dangerous or fatal consequences." *Id.* at 416-17. Despite the defendant's statement that he would kill the victim for two cents, the supreme court found neither an intent to kill nor that death was a reasonable or probable consequence of the defendant's blow. *Id.* at 417.

¶ 54        In *Nibbe*, 2016 IL App (4th) 140363, ¶ 28, this court discussed exceptions to the

*Crenshaw* rule as follows:

> "Over time, Illinois courts have recognized exceptions to
> the principle that death is not ordinarily contemplated as a natural
> consequence of blows from bare fists.  See *People v. Gresham*, 78
> Ill. App. 3d 1003, 1007, 398 N.E.2d 398, 402 (1979) (recognizing
> the striking of an individual with fists that results in the
> individual's death may be involuntary manslaughter or murder).  In
> *People v. Ward*, 101 Ill. 2d 443, 452, 463 N.E.2d 696, 700 (1984),
> our supreme court recognized a blow from a bare fist could result
> in murder where there was a great disparity in size and strength
> between the defendant and the victim.  The *Ward* case involved an
> adult defendant convicted of the beating death of a four-year-old
> boy.  *Ward*, 101 Ill. 2d at 446, 463 N.E.2d at 697.  In *People v.
> Brackett*, 117 Ill. 2d 170, 180, 510 N.E.2d 877, 882 (1987), our
> supreme court again recognized 'death may be the natural
> consequence of blows with bare fists where there is great disparity
> in size and strength between the two parties.'  There, the 21-year-
> old defendant had raped and severely beaten with his bare hands an
> 85-year-old woman over the course of an evening.  *Brackett*, 117
> Ill. 2d at 173, 510 N.E.2d at 879.  Additionally, the supreme court
> declined to follow *Crenshaw* when the fatal blow was struck in the
> 'prosecution of the felonious intent to rape the deceased,' which is

referred to as felony murder. *People v. Doherty*, 28 Ill. 2d 528, 531, 193 N.E.2d 37, 38 (1963). In *Doherty*, 28 Ill.2d at 530, 193 N.E.2d at 38, a group of men sought to rape a woman, some of the men did have intercourse with her, and a blow by one of the group caused the woman to strike her head on a sidewalk, which resulted in her death. Illinois appellate courts have found another exception when the defendant inflicted multiple blows to the victim. See *People v. Rodgers*, 254 Ill. App. 3d 148, 152-54, 626 N.E.2d 260, 263-64 (1993), *vacated on other grounds*, 156 Ill. 2d 564, 634 N.E.2d 751 (1994), *readopted in pertinent part*, 265 Ill. App. 3d 1, 2, 637 N.E.2d 775, 776 (1994) (where the defendant punched the victim in the head numerous times while the victim was sleeping); *People v. Freeman*, 78 Ill. App. 2d 242, 246, 254, 223 N.E.2d 444, 446, 450 (1966) (finding the State's evidence was sufficient to sustain the defendant's murder conviction where the pathologist testified the victim's death was caused by a beating that could have been done by a human hand)."

¶ 55 The State argues a reasonable jury could conclude from the extent of Daye Lynn's injuries that defendant knew her acts created a strong probability of great bodily harm or death to Daye Lynn. In support of this argument, the State cites *Ward*, 101 Ill. 2d at 463 and *Rodgers*, 254 Ill. App. 3d 148. In *Ward*, the supreme court concluded the trial court did not err by not instructing the jury on involuntary manslaughter where the severity of the beating negated any suggestion the defendant's conduct was reckless. *Ward*, 101 Ill. 2d at 451. The defendant, an

adult man, beat a child with a mop stick on his chest, stomach, and back on two occasions. *Id.* at 446-47. In concluding the defendant's conduct was not merely reckless, the supreme court noted, "A blow from a bare fist can result in murder where, as here, there is great disparity in size and strength between the defendant and the victim." *Id.* at 452. In *Rodgers*, the appellate court concluded the trial court did not err in refusing an instruction on involuntary manslaughter where the defendant pummeled the sleeping victim with approximately 10 punches after the defendant had repeatedly threatened to kill the victim. *Rodgers*, 254 Ill. App. 3d at 153. The victim was found "lying on the floor with blood streaming down his face and coagulating on the carpet." *Id.*

¶ 56    Defendant argues the proposition that a disparity in size between the victim and defendant cannot operate to show intent in this case because Daye Lynn was six inches taller than defendant and outweighed defendant. Defendant argues the present case is more akin to *Nibbe*, 2016 IL App (4th) 140363, and *People v. Lengyel*, 2015 IL App (1st) 131022, 38 N.E.3d 171. In *Lengyel*, the defendant and his father got into a physical altercation and the defendant punched his father four or five times in the head. *Lengyel*, 2015 IL App (1st) 131022, ¶¶ 6, 10. After the defendant saw blood, he stopped hitting his father, went into his room, and locked the door. *Id.* ¶ 11. The defendant's father broke through the bedroom door and eventually asked the defendant to call an ambulance. *Id.* The father died two days later from "a stroke due to an increase in blood pressure caused by stress from injuries." *Id.* ¶¶ 6, 27. The State charged the defendant with intentional and knowing first degree murder, and a jury found the defendant guilty of second-degree murder. *Id.* ¶¶ 13, 30. On appeal, the defendant argued he did not knowingly kill his father, "citing (1) the fight's brevity, (2) the limited number of punches (four

or five), and (3) the cause of death being attributed to a stroke and not directly to his having struck [his father]." *Id.* ¶ 50.

¶ 57 Citing *Brackett*, the State argued the disparity in size and strength between the defendant and his father negated the principle that death is not normally a reasonable or probable consequence of a barehanded blow. *Id.* ¶ 52. The reviewing court rejected the State's argument and found *Brackett* distinguishable where the defendant and the victim were of similar size and the altercation lasted only a few minutes. *Id.* ¶ 53. Although the father had multiple health problems, he was able to break open the locked bedroom door after the fight. *Id.* Further, the defendant did not use a weapon and stopped punching as soon as he saw blood. *Id.*

¶ 58 The *Lengyel* court concluded the evidence was insufficient to prove beyond a reasonable doubt the defendant knowingly killed his father where the defendant punched his father "solely with his fists and where those punches did not directly cause death." *Id.* ¶ 55. The court further concluded the defendant's actions constituted involuntary manslaughter. *Id.* ¶ 64. Thus, under Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967), the court reduced the defendant's conviction for second-degree murder to involuntary manslaughter and remanded for resentencing. *Id.*

¶ 59 In *Nibbe*, the defendant punched the victim one time on the right side of his face. *Nibbe*, 2016 IL App (4th) 140363, ¶ 8. A witness testified the victim "was knocked out and 'was snoring before he even hit the ground.' " *Id.* The victim fell backward and hit his head on the concrete. *Id.* The fall backward onto a surface caused the victim's death. *Id.* ¶¶ 18-19. A jury found the defendant guilty of second-degree murder. *Id.* ¶ 20.

¶ 60 On appeal, the defendant argued the State failed to prove the defendant knew the punch created a strong probability of death or great bodily harm. *Id.* ¶ 26. This court, citing

*Jones* and *Crenshaw*, acknowledged the long-standing principle that death is not ordinarily contemplated as a natural consequence of blows from bare fists. *Id.* ¶ 27. The State argued a disparity in size existed between the defendant and the victim. This court noted the defendant was 34 years old, was six feet tall, and weighed 220 pounds, while the victim was 44 years old, was five feet ten inches tall, and weighed 188 pounds (after organ donation). *Id.* ¶ 30.

¶ 61　　　　This court further found that the principle that death is not ordinarily contemplated as a natural consequence of blows from bare fists was applicable. *Id.* ¶ 34. Although the State emphasized the force with which the defendant punched the victim to cause the facial injuries, unconsciousness, and the fall to the sidewalk, this court found the punch was not "as egregious as the one in *Crenshaw*, which broke the victim's neck and directly caused the victim's death within a few minutes." *Id.* Although the victim's death was more foreseeable than the victim's death in *Langyel*, "the evidence did not show a strong probability [the victim] would fall and strike his head on the concrete with the force that it did." *Id.* This court concluded the evidence was insufficient to prove the defendant struck the victim with the knowledge the punch created a strong probability of death or great bodily harm and vacated the defendant's conviction for second-degree murder. *Id.*

¶ 62　　　　We find this case more similar to *Rodgers* than *Lengyel* and *Nibbe*. Here, the evidence established that defendant and Daye Lynn got into a physical altercation. Defendant testified Daye Lynn began hitting her and got on top of her. Defendant testified she hit Daye Lynn, eventually got Daye Lynn off of her, and left the room. Daye Lynn called defendant back and stated she felt unwell. Defendant then went to bed and did not make any effort to seek medical care for Daye Lynn for *three days*. At trial, Dr. Denton testified he observed extensive bruising from blunt trauma on Daye Lynn's cheeks, nose, neck, and limbs. Daye Lynn also had

- 20 -

bruising on her torso that was consistent with blunt force trauma and occurred within one to three days of her death. There was also internal bruising on her neck, liver, and ribs consistent with blunt trauma. Although defendant argues this case involved only two punches, Dr. Denton's testimony established Daye Lynn suffered numerous blows in addition to the two punches that directly caused her death. The extent of the beating Daye Lynn suffered is more akin to *Rodgers*, where the defendant pummeled the sleeping victim with approximately 10 punches and the victim was found lying on the floor. *Rodgers*, 254 Ill. App. 3d at 153.

¶ 63        Defendant argues her failure to seek medical care for Daye Lynn does not prove defendant knew the punches created a strong probability of death or great bodily harm. The State argues defendant's failure to seek medical care for Daye Lynn for three days indicates a consciousness of guilt. Count II alleged defendant, without lawful justification and knowing her acts created a strong probability of death or great bodily harm, performed the acts which caused the death of Daye Lynn (720 ILCS 5/9-1(a)(2) (West 2018)). During closing argument, the prosecutor argued the jury should consider defendant's actions after the fight occurred. Additionally, the jury was instructed that the definition of the word "act" included a failure or omission to take action. Although defendant focuses on the fact she struck her wife twice with a bare fist, the evidence showed considerable injury caused by additional blows. Additionally, the failure to act after the blows constituted a failure or omission to take action that created a strong probability of death or great bodily harm. This conclusion is further supported by Dr. Denton's testimony regarding the stages Daye Lynn likely went through after being struck, including the loss of consciousness and the snoring respirations. After reviewing the evidence in the light most favorable to the State, we conclude a rational trier of fact could find defendant guilty of first degree murder beyond a reasonable doubt.

¶ 64                                    B. Sentence

¶ 65            Defendant next asserts the trial court abused its discretion in sentencing defendant

to 50 years' imprisonment.  The State asserts defendant forfeited her sentencing claims by failing

to file a motion to reconsider the sentence.  Defendant concedes she forfeited this claim but asks

this court to review her claim under the plain-error doctrine.

¶ 66            Under the plain-error doctrine, the defendant must first demonstrate a clear or

obvious error.  *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010).  "In the

sentencing context, a defendant must then show either that (1) the evidence at the sentencing

hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair

sentencing hearing."  *Id.*  Because we conclude no error occurred, we address the merits of

defendant's argument.

¶ 67            A trial court's sentencing decisions are given substantial deference.  *People v.*

*Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656.  We will disturb a sentence within the statutory

limits for the offense only if the trial court abused its discretion.  *People v. Flores*, 404 Ill. App.

3d 155, 157, 935 N.E.2d 1151, 1154 (2010).  A court abuses its discretion when imposing a

sentence "greatly at variance with the spirit and purpose of the law, or manifestly

disproportionate to the nature of the offense."  *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d

626, 629 (2000).

¶ 68            In determining an appropriate sentence, the trial court may consider the

seriousness, nature, and circumstances of the offense, including the nature and extent of the

elements of the offense.  *People v. Saldivar*, 113 Ill. 2d 256, 271-72, 497 N.E.2d 1138, 1144

(1986).  The court is not required to explicitly outline the factors considered for sentencing and

we presume the court considered all mitigating factors absent explicit evidence to the contrary.

*People v. Meeks*, 81 Ill. 2d 524, 534, 411 N.E.2d 9, 14 (1980). Each sentencing decision must be based on a consideration of factors including "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999). The trial court is better able to weigh these factors, having observed the defendant and proceedings. *Id.* We will not substitute our judgment for that of the trial court merely because we would have balanced the factors differently. *Id.*

¶ 69    Here, defendant was eligible for an extended-term sentence of 20 to 100 years' imprisonment. 730 ILCS 5/5-4.5-20(a); 730 ILCS 5/5-5-3.2(b)(3)(ii) (West 2018). At sentencing, the trial court stated there were no factors in mitigation that met the situation. In aggravation, the court noted defendant's history of criminal activity, the need to deter others from committing the same offense, the victim was 60 years of age or older, and defendant was on probation at the time she committed the offense. The court stated it considered the nature and circumstances of the offense and the history, character, and condition of defendant and sentenced defendant to 50 years' imprisonment with a three-year term of mandatory supervised release.

¶ 70    Defendant contends the trial court failed to adequately consider defendant's rehabilitative potential and defendant's substance abuse and mental illness as factors in mitigation. Defendant further asserts the court failed to find defendant irredeemable before sentencing her to a *de facto* life sentence. Defendant contends the court erred in finding no mitigating factors applied while giving express weight to defendant's criminal history and the age of the victim.

¶ 71    As discussed above, the court is not required to explicitly outline the factors considered for sentencing and we presume the court considered all mitigating factors absent explicit evidence to the contrary. *Meeks*, 81 Ill. 2d at 534. The court had before it evidence of

defendant's struggles with substance abuse and mental health, and we presume the court considered all relevant mitigating factors. The court emphasized defendant's lack of empathy or concern for Daye Lynn following the altercation and noted defendant's criminal history. We cannot say the court gave improper weight to defendant's criminal history. Although defendant's criminal history did not include violent offenses, she had previously been convicted of five felonies and was on probation when she committed the present offense. Given these circumstances, we conclude the trial court did not abuse its discretion in sentencing defendant to 50 years' imprisonment for first degree murder. Accordingly, we affirm the judgment of the trial court.

¶ 72                                    III. CONCLUSION

¶ 73            For the reasons stated, we affirm the trial court's judgment.

¶ 74            Affirmed.