2016 IL App (4th) 140363

NO. 4-14-0363

FILED
February 10, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Ford County |
| RYAN A. NIBBE, | ) | No. 13CF57 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul G. Lawrence, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court, with opinion.
Justices Harris and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1        In August 2013, the State charged defendant, Ryan A. Nibbe, by information with

one count of aggravated battery (great bodily harm) (720 ILCS 5/12-3.05(a)(1) (West 2012)),

one count of aggravated battery (public way) (720 ILCS 5/12-3.05(c) (West 2012)), and one

count of second degree murder (720 ILCS 5/9-2(a)(2) (West 2012)).  After a January 2014 trial,

a jury found defendant guilty of second degree murder and aggravated battery (public way) and

not guilty of aggravated battery (great bodily harm).  Defendant filed a motion for a new trial.

At a joint hearing in February 2014, the Ford County circuit court denied defendant's posttrial

motion and sentenced him to 17 years' imprisonment for second degree murder.  Defendant filed

a motion to reconsider his sentence, which the court denied after a March 31, 2014, hearing.

¶ 2        Defendant appeals, asserting (1) the State's evidence was insufficient to prove him

guilty of second degree murder, and (2) his convictions for aggravated battery and second degree

murder should be reversed because the evidence established he acted in self-defense. We reverse and remand with directions.

¶ 3                               I. BACKGROUND

¶ 4        All three counts relate to the July 28, 2013, incident in which defendant struck Timothy Robertson. Count I asserted defendant committed aggravated battery in that he, in committing a battery, knowingly caused great bodily harm to Robertson by striking Robertson in the face with his fist, causing Robertson to fall and fracture his skull. Count II alleged defendant committed aggravated battery based on defendant striking Robertson's face with his fist on a sidewalk on North Sangamon Avenue, a public way. Count III asserted defendant committed second degree murder in that he, while committing first degree murder, knowingly punched Robertson in the face, causing Robertson to fall and fracture his skull, which caused Robertson's death, and at the time of the killing, defendant unreasonably believed the circumstances to be such that, if they existed, they would justify or exonerate the killing. Defendant asserted the affirmative defenses of self-defense and defense of another.

¶ 5        On January 22, 2014, the circuit court commenced defendant's jury trial. The State presented the testimony of the responding police officers, Kevin Conrad and Ryan Iverson; Officer Adam Rosendahl, who helped in the investigation of the incident; Carrie Schneider and Terry Carahan, the paramedics who transported Robertson to the hospital; Dr. Richard Rak, the neurosurgeon who treated Robertson; Dr. Amanda Youmans, who performed Robertson's autopsy; Beth Bridgwater, Robertson's girlfriend; Jason Battishill, eyewitness and occupant of the apartment where the incident began; and Lisa Grice, Battishill's girlfriend. The State also presented photographs of Robertson, his medical reports from the incident, and his autopsy report. Defendant testified on his own behalf and presented the testimony of his ex-girlfriend,

Ashley Sutton. Defendant also presented Grice's written statement and the toxicology report for Robertson. The State called Rosendahl in rebuttal. The evidence relevant to the issues on appeal is set forth below.

¶ 6 Battishill testified that, in July 2013, he lived with Grice in an upstairs apartment at 130 North Sangamon Avenue in Gibson City, Illinois. Around 30 stairs led up to the apartment, and there was no door at the top of the stairs. At the bottom of the stairs was the door that led to the outside, and a sidewalk was right outside the door. No other apartments were located in the building. The door to the sidewalk could only be locked on the outside with a padlock. Sometimes, Battishill placed a board behind the door to the stairs to secure it when he was home.

¶ 7 On the night of July 27 and in the early morning hours of July 28, 2013, Battishill and Grice were home and defendant and Sutton were "hanging out" with them. Battishill stated he was not drinking alcohol, but defendant was. While they were listening to music, Grice stated she heard someone walking up the stairs. Battishill had not used the board that night to secure the door. Defendant got up first and started walking toward the stairs, and Battishill followed. Robertson, whom no one knew, was about a quarter to halfway up the stairs when defendant asked Robertson what he was doing and told him it was not his apartment. Robertson did not verbally respond but appeared to push or punch defendant. Defendant punched Robertson, who stumbled down the stairs but did not fall. Robertson then walked out the open door onto the sidewalk.

¶ 8 Defendant went outside and Battishill stayed in the doorway. According to Battishill, Robertson appeared to be walking away and did not attempt to reenter the apartment. Defendant said the following to Robertson: " 'Dude, what are you doing coming here? This ain't

your apartment.' " On cross-examination, Battishill testified defendant stated, "This wasn't your apartment. Why are you here? Come here." Robertson then began to walk back toward defendant. Robertson had his hands down at his side and appeared slouched over a bit. His walk was a "little staggered." When Robertson was about half a foot away from defendant, defendant punched Robertson on the right side of his face. Battishill stated Robertson did not attempt to punch defendant first, and Robertson did not make any kind of threatening or provoking gestures toward defendant. Battishill testified Robertson was knocked out and "was snoring before he even hit the ground." Robertson fell forward a little and then all the way backward, hitting his head on the concrete. When Robertson's head hit the concrete, it sounded "like his head popped." Robertson was lying about six to seven feet from the apartment door and smelled of alcohol. Defendant told Battishill to call the police before he left the scene, and Battishill asked Grice for his cellular telephone (cell phone). Defendant also told Battishill not to say who punched Robertson. At some point, Battishill observed defendant bleeding from his right hand.

¶ 9       Battishill flagged the police down as they approached his apartment. Officer Conrad was the first to arrive and focused on Robertson. Officer Iverson arrived next and questioned Battishill about who hit Robertson. Battishill refused to tell Officer Iverson at first because he was afraid of defendant. Battishill stated he was more afraid of defendant than the police. It was only after Officer Iverson threatened to lock up Battishill for obstruction of justice that Battishill named defendant. Officer Iverson then borrowed Battishill's cell phone to call defendant. Officer Iverson asked defendant to return to the scene, and Sutton drove defendant back to Battishill's apartment.

¶ 10      When defendant returned, the police asked for his side of the story. Defendant asked if he was under arrest, and the police responded in the negative. Defendant then stated, " 'I

am Mr. Nibbe.  I am the baddest mother-f*** around.' "  The police talked to defendant and then talked with Battishill.  In the police's presence, defendant stated "he was going to kick [Battishill's] a*** for telling on him."  Battishill did not remember telling the police Robertson threw a punch at defendant when they were outside.

¶ 11        On July 29, 2013, Battishill received a call from defendant.  Defendant stated everything was okay and they were not going to press charges.  He also stated, " 'I told you I knock people out.  My heart does not bleed Cool Aide [*sic*].' "  Battishill acknowledged he had prior convictions for residential burglary and delivery of cannabis.

¶ 12        Grice testified she did not witness any of the altercation between defendant and Robertson.  When defendant returned to the scene, he told her to change her statement to say she saw the victim hit defendant.  She was scared and nervous.  Grice was afraid that, if she did not change her story, defendant would get out of jail and hurt her.

¶ 13        Officer Conrad testified he found Robertson 11 feet away from the apartment door.  When he talked with Battishill at the scene, Battishill stated Robertson had attempted to punch defendant on the sidewalk before defendant punched Robertson.  According to Officer Conrad, defendant and Sutton returned to the scene about 5 to 10 minutes after his arrival.  When defendant arrived, he asked if he was under arrest.  The officers told him they just needed to hear his side of the story.  Defendant then asked if they were going to put him in handcuffs.  They again told defendant they just needed to hear his side of the story.  Defendant then replied in a loud voice that " 'he was the biggest, whitest, mother-f*** around.' "  Defendant admitted punching Robertson because he should not have come up to Battishill's apartment.  Defendant said Robertson swung at him and "he busted him in the shit."  Defendant did not mention anything to him about defending himself or others in the apartment.  Officer Conrad observed

that defendant's eyes were glassy and bloodshot, and he smelled alcohol on defendant's breath. Officer Conrad also testified defendant stated he was going to beat up Battishill for "ratting him out" to the police. Additionally, Sutton did not make a statement.

¶ 14 Officer Iverson testified Battishill told him Robertson came at defendant on the sidewalk and swung at him and defendant then hit Robertson in the face. He also testified defendant came back quickly after he called defendant. Officer Iverson also testified about defendant's comments when he first arrived on the scene and the smell of alcohol on defendant. Officer Iverson also observed blood on defendant's right hand. Defendant told Officer Iverson he was concerned for the safety of Grice and Sutton when Robertson came up the stairs.

¶ 15 Defendant testified he was 34 years old and had prior convictions for unlawful restraint, obstruction of justice, and driving under the influence. Defendant testified he saw Robertson on the third or fourth step of the stairs and took charge. He went down the stairs and questioned Robertson about what he was doing. Defendant said he was scared to death because he did not know the man. Robertson said nothing and struck defendant twice, hitting him on the collarbone and face. Defendant then punched Robertson, who then backed down the stairs. Defendant followed Robertson. Robertson appeared to be leaving. Defendant told him, " 'Sir, you need to keep going. The police are coming.' " Battishill then said, " 'You need to leave my property. You don't belong here.' " Robertson then turned and started walking toward defendant. Defendant observed the left side of Robertson's face was "messed up." Defendant continued to tell Robertson to walk away and the police were coming. Robertson continued to walk toward defendant. Defendant let him get within an arm's length of him, and then defendant struck Robertson. Defendant had no doubt Robertson was going to hit him. Defendant stated Robertson was getting ready to strike him.

¶ 16    Defendant denied intending to harm Robertson, whom defendant did not know. He did not want Robertson harming them. Defendant could not provide a written statement due to the injury to his hand and had Sutton write a statement for him. Moreover, defendant admitted to being concerned about getting arrested because he had a bad record. Defendant also admitted he had a temper problem and explained his mother-f*** statement was in response to Officer Conrad's baiting. Last, defendant admitted he refused to make a statement to the police a week after the incident.

¶ 17    Schneider, the paramedic, testified that, when she arrived at the scene, Robertson was totally unresponsive and had swelling and a hematoma to his eye and forehead.

¶ 18    Dr. Rak treated Robertson from July 28, 2013, until Robertson's death on August 5, 2013. Robertson suffered significant head trauma. A physical examination showed Robertson had bruising above the left eye. A computerized tomography scan showed Robertson had a fracture in his upper jaw, nasal bone, and cheek bone. He also had a skull fracture from the left skull base going over the top of his ear. Additionally, Robertson had a significant brain injury with hemorrhaging in both the frontal and temporal lobes of the brain. The brain injury was from Robertson falling backward and hitting the back of his head.

¶ 19    Dr. Youmans testified it was the fall backward onto a surface that caused Robertson's death. She explained he had extensive skull fractures that extended from the back of the head to the front of the head. Robertson had a bruise over the skull in the back, and underneath it was where the skull fracture began. Robertson also had fractures in many of the smaller bones at the base of the skull and his skull sinuses were fractured as well.

¶ 20    After hearing all the evidence and the parties' arguments, the jury found defendant guilty of second degree murder and aggravated battery (public way) and not guilty of aggravated

battery (great bodily harm).  On February 10, 2014, defendant filed a motion for a new trial.  On February 24, 2014, the circuit court held a joint hearing on the posttrial motion and sentencing.  After hearing the parties' arguments, the court denied defendant's motion for a new trial.  As to sentencing, the court noted it would not sentence defendant on aggravated battery (public way) based on the one-act, one-crime rule.  The court sentenced defendant to 17 years' imprisonment for second degree murder.  On March 24, 2014, defendant filed a motion to reconsider his sentence.  After a March 31, 2014, hearing, the court denied defendant's motion to reconsider his sentence.

¶ 21        On May 16, 2014, defendant filed a timely motion for leave to file a late notice of appeal under Illinois Supreme Court Rule 606(c) (eff. Feb. 6, 2013), which this court granted.  Defendant then filed his late notice of appeal.  Accordingly, we have jurisdiction under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 22                              II. ANALYSIS

¶ 23        On appeal, defendant raises two challenges to the sufficiency of the State's evidence.  When presented with a challenge to the sufficiency of the evidence, a reviewing court's function is not to retry the defendant.  *People v. Givens*, 237 Ill. 2d 311, 334, 934 N.E.2d 470, 484 (2010).  Rather, we consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (Emphasis in original.)  *People v. Davison*, 233 Ill. 2d 30, 43, 906 N.E.2d 545, 553 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  " 'Under this standard, the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence.' "

*People v. Washington*, 2012 IL 107993, ¶ 33, 969 N.E.2d 349 (quoting *People v. Ross*, 229 Ill. 2d 255, 272, 891 N.E.2d 865, 876 (2008)).

¶ 24                    A. Second Degree Murder

¶ 25        Second degree murder is first degree murder plus a mitigating factor. *People v. Porter*, 168 Ill. 2d 201, 213, 659 N.E.2d 915, 921 (1995). Thus, "a defendant can only be found guilty of second degree murder if the State has first proven all the elements of first degree murder." *People v. Wilmington*, 2013 IL 112938, ¶ 48, 983 N.E.2d 1015. Under Illinois law, three different theories of first degree murder exist, namely intentional murder (720 ILCS 5/9-1(a)(1) (West 2006)), knowing murder (720 ILCS 5/9-1(a)(2) (West 2006)), and felony murder (720 ILCS 5/9-1(a)(3) (West 2006)). *People v. Smith*, 233 Ill. 2d 1, 16, 906 N.E.2d 529, 538 (2009). At issue in this case is knowing murder. A person is guilty of first degree murder under a knowing murder theory if he killed another without lawful justification with the knowledge his acts created "a strong probability of death or great bodily harm." 720 ILCS 5/9-1(a)(2) (West 2012). "[S]trong probability" is the situation which lies between the "practical certainty" and the "likely cause" and "substantial and unjustifiable risk" of involuntary manslaughter. (Internal quotation marks omitted.) *People v. Davis*, 35 Ill. 2d 55, 60, 219 N.E.2d 468, 471 (1966). One of the mitigating factors established by the second degree murder statute is that, at the time of the killing, the defendant believed "the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2012). This mitigating factor is referred to as "imperfect self-defense" (*People v. Davis*, 213 Ill. 2d 459, 492, 821 N.E.2d 1154, 1173 (2004)), and it is the mitigating factor charged by the State in this case.

¶ 26        Defendant contends the State's evidence failed to prove he *knew* his single punch

to Robertson's face created a strong probability of death or great bodily harm.  Direct evidence rarely proves a defendant's mental state, and thus a defendant's mental state may be inferred from the surrounding circumstances, including the character of the defendant's acts and the nature of the victim's injuries.  *People v. Jones*, 404 Ill. App. 3d 734, 744, 936 N.E.2d 1160, 1169-70 (2010).  "Generally, the question of whether a defendant acted intentionally, knowingly, or merely recklessly is a question to be resolved by the trier of fact."  *Jones*, 404 Ill. App. 3d at 744, 936 N.E.2d at 1170.  However, the trier of fact's determination is not conclusive.  *Jones*, 404 Ill. App. 3d at 744, 936 N.E.2d at 1170.  A reviewing court must reverse a conviction where, after reviewing the evidence and giving due consideration that the trier of fact had the opportunity to see and hear the witnesses, it is of the opinion the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt.  *Jones*, 404 Ill. App. 3d at 744, 936 N.E.2d at 1170.

¶ 27        "There is a long-standing principle in Illinois that death is not ordinarily contemplated as a natural consequence of blows from bare fists."  *Jones*, 404 Ill. App. 3d at 748, 936 N.E.2d at 1173.  In *People v. Crenshaw*, 298 Ill. 412, 414, 131 N.E. 576, 576-77 (1921), the defendant sought out the victim, took the victim by the arm, turned him partially around, and told him that he would kill him for two cents.  The defendant then immediately struck the victim in the face with a clenched fist, knocking the victim down, and the victim died shortly thereafter.  *Crenshaw*, 298 Ill. at 414, 131 N.E. at 577.  The victim's cause of death was attributable only to the defendant's blow.  *Crenshaw*, 298 Ill. at 414, 131 N.E. at 577.  In reversing the defendant's murder conviction, our supreme court stated, "[t]he striking of a blow with the fist on the side of the face or head is not likely to be attended with dangerous or fatal consequences."  *Crenshaw*, 298 Ill. at 416-17, 131 N.E. at 577.  Despite defendant's statement, our supreme court found neither an intent to kill based on the case's circumstances nor that death was a reasonable or

probable consequence of the defendant's bare-fisted blow. *Crenshaw*, 298 Ill. at 417, 131 N.E. at 578.

¶ 28        Over time, Illinois courts have recognized exceptions to the principle that death is not ordinarily contemplated as a natural consequence of blows from bare fists. See *People v. Gresham*, 78 Ill. App. 3d 1003, 1007, 398 N.E.2d 398, 402 (1979) (recognizing the striking of an individual with fists that results in the individual's death may be involuntary manslaughter or murder). In *People v. Ward*, 101 Ill. 2d 443, 452, 463 N.E.2d 696, 700 (1984), our supreme court recognized a blow from a bare fist could result in murder where there was a great disparity in size and strength between the defendant and the victim. The *Ward* case involved an adult defendant convicted of the beating death of a four-year-old boy. *Ward*, 101 Ill. 2d at 446, 463 N.E.2d at 697. In *People v. Brackett*, 117 Ill. 2d 170, 180, 510 N.E.2d 877, 882 (1987), our supreme court again recognized "death may be the natural consequence of blows with bare fists where there is great disparity in size and strength between the two parties." There, the 21-year-old defendant had raped and severely beaten with his bare hands an 85-year-old woman over the course of an evening. *Brackett*, 117 Ill. 2d at 173, 510 N.E.2d at 879. Additionally, the supreme court declined to follow *Crenshaw* when the fatal blow was struck in the "prosecution of the felonious intent to rape the deceased," which is referred to as felony murder. *People v. Doherty*, 28 Ill. 2d 528, 531, 193 N.E.2d 37, 38 (1963). In *Doherty*, 28 Ill. 2d at 530, 193 N.E.2d at 38, a group of men sought to rape a woman, some of the men did have intercourse with her, and a blow by one of the group caused the woman to strike her head on a sidewalk, which resulted in her death. Illinois appellate courts have found another exception when the defendant inflicted multiple blows to the victim. See *People v. Rodgers*, 254 Ill. App. 3d 148, 152-54, 626 N.E.2d 260, 263-64 (1993), *vacated on other grounds*, 156 Ill. 2d 564, 634 N.E.2d 751 (1994),

*readopted in pertinent part*, 265 Ill. App. 3d 1, 2, 637 N.E.2d 775, 776 (1994) (where the defendant punched the victim in the head numerous times while the victim was sleeping); *People v. Freeman*, 78 Ill. App. 2d 242, 246, 254, 223 N.E.2d 444, 446, 450 (1966) (finding the State's evidence was sufficient to sustain the defendant's murder conviction where the pathologist testified the victim's death was caused by a beating that could have been done by a human hand).

¶ 29       The State suggests *People v. Farrell*, 89 Ill. App. 3d 262, 411 N.E.2d 927 (1980), is another exception to *Crenshaw*. However, *Farrell* involved an aggravated battery conviction and not a murder conviction. The *Farrell* court did not discuss *Crenshaw*. Thus, we find it inapplicable to our analysis. Moreover, even if *Farrell* established an exception to *Crenshaw*, its facts are distinguishable from the facts of this case. In *Farrell*, 89 Ill. App. 3d at 265, 411 N.E.2d at 930, the 18-year-old defendant struck the 36-year-old victim in the side of the face near the eye, resulting in a bone fracture and a scar near the victim's eye. The *Farrell* court found the attack indicated defendant's intent to cause aggravated damage since defendant directed his punch to the victim's eye, "one of the most sensitive areas of the body." *Farrell*, 89 Ill. App. 3d at 265, 411 N.E.2d at 930. In this case, the evidence did not indicate defendant, who had been drinking alcohol and was in an excited state due to Robertson's entry, directed his punch at Robertson's eye.

¶ 30       The State also contends a disparity in size existed between defendant and Robertson. It argues defendant was taller, bigger, and younger than Robertson. Robertson's autopsy report stated he was 44 years old; was 5 feet, 10 inches; and weighed 188 pounds (after organ donation). Defendant testified he was 34 years old and his presentence investigation report stated he was 6 feet tall and weighed 220 pounds. While defendant was slightly larger than Robertson, a large disparity in age, size, and strength does not exist in this case as it did in

*Brackett* and *Ward*. Moreover, in *Crenshaw*, 298 Ill. at 417-18, 131 N.E. at 578, the supreme court found a disparity in size did not exist where the defendant was five or six inches taller and about 50 pounds heavier than the victim. Accordingly, the disparity in size exception does not apply to the facts of this case.

¶ 31 One of the cases defendant cites in support of his argument is the First District's recent decision in *People v. Lengyel*, 2015 IL App (1st) 131022, 38 N.E.3d 171. There, the defendant and his father got into a physical altercation, and the father died two days later from a stroke. *Lengyel*, 2015 IL App (1st) 131022, ¶ 6, 38 N.E.3d 171. The State charged the defendant with intentional and knowing first degree murder, and a jury found the defendant guilty of second degree murder. *Lengyel*, 2015 IL App (1st) 131022, ¶¶ 13, 30, 38 N.E.3d 171. On appeal, the defendant argued he did not knowingly kill his father due to the fight's brevity, his limited number of punches (four or five), and the cause of his father's death being attributed to a stroke and not directly to his having struck him. *Lengyel*, 2015 IL App (1st) 131022, ¶ 50, 38 N.E.3d 171.

¶ 32 Citing *Brackett*, the State argued the disparity in size and strength between the defendant and his father negated the principle that death is not normally a reasonable or probable consequence of a bare-fisted blow. *Lengyel*, 2015 IL App (1st) 131022, ¶ 52, 38 N.E.3d 171. The evidence showed the defendant was 6 feet 1 inch tall and weighed 220 pounds, and his father was 6 feet 2 inches tall and weighed 240 pounds. *Lengyel*, 2015 IL App (1st) 131022, ¶ 53, 38 N.E.3d 171. The father had multiple health problems but was strong enough to break open a locked bedroom after the altercation. Additionally, the defendant stopped punching his father as soon as he saw blood. The reviewing court rejected the State's argument, finding *Brackett* distinguishable because the defendant and his victim were similar in size and the

altercation lasted only "a matter of minutes." *Lengyel*, 2015 IL App (1st) 131022, ¶ 53, 38 N.E.3d 171.

¶ 33     The *Lengyel* court concluded the evidence was insufficient to establish beyond a reasonable doubt the defendant knowingly killed his father because the defendant punched his father solely with his fists and those punches did not directly cause his father's death. *Lengyel*, 2015 IL App (1st) 131022, ¶ 55, 38 N.E.3d 171. It then went on to address involuntary manslaughter. *Lengyel*, 2015 IL App (1st) 131022, ¶¶ 57-65, 38 N.E.3d 171. The court found the defendant's actions constituted involuntary manslaughter, not second degree murder. *Lengyel*, 2015 IL App (1st) 131022, ¶ 64, 38 N.E.3d 171. Thus, under Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967), it reduced the defendant's second degree murder conviction to involuntary manslaughter and remanded the case for resentencing. *Lengyel*, 2015 IL App (1st) 131022, ¶ 69, 38 N.E.3d 171.

¶ 34     In this case, we find the principle that death is not ordinarily contemplated as a natural consequence of blows from bare fists is applicable. The State has not cited any cases where one blow with a bare hand by a single assailant was sufficient to sustain a first degree murder conviction. The State emphasizes the force with which defendant must have struck defendant to cause the facial injuries, unconsciousness, and fall onto the concrete sidewalk. However, the punch in this case does not appear to be as egregious as the one in *Crenshaw*, which broke the victim's neck and directly caused the victim's death within a few minutes. Here, Robertson was not substantially smaller or weaker than defendant, and Robertson died from his head striking the concrete and not from the blow to the face. While Robertson's death is more foreseeable than the victim's death in *Lengyel*, Robertson was not a small person, and the evidence did not show a strong probability Robertson would fall and strike his head on the

- 14 -

concrete with the force that it did. Moreover, defendant had been drinking and was in an excitable state due to Robertson's entry. Accordingly, we find the State's evidence was insufficient to prove defendant struck Robertson with the knowledge the punch created "a strong probability of death or great bodily harm." 720 ILCS 5/9-1(a)(2) (West 2012).

¶ 35    Unlike in *Lengyel*, defendant neither argues he should have been found guilty of involuntary manslaughter nor suggests an involuntary manslaughter defense should have been raised in the circuit court. Moreover, defendant was found guilty of aggravated battery (public way) for his punching Robertson on the sidewalk. Thus, we do not reduce defendant's second degree murder conviction to involuntary manslaughter. Instead, we vacate it and remand the cause for sentencing defendant for aggravated battery (public way).

¶ 36                                B. Self-Defense

¶ 37    Defendant also asserts his aggravated battery conviction (public way) should be reversed because the evidence established he acted in self-defense when he hit Robertson on the sidewalk.

¶ 38    Self-defense is an affirmative defense. *People v. Jeffries*, 164 Ill. 2d 104, 127, 646 N.E.2d 587, 597 (1995). When a defendant raises self-defense and provides some evidence of it, the State has the burden of proving beyond a reasonable doubt the defendant did not act in self-defense along with the elements of the charged offense. *Jeffries*, 164 Ill. 2d at 127, 646 N.E.2d at 597. Under Illinois law, a defendant acts in self-defense when: (1) force was threatened against the defendant; (2) the defendant was not the aggressor; (3) the danger of harm was imminent; (4) the force threatened was unlawful; (5) the defendant actually believed a danger existed and the use of force was necessary to avert it; and (6) the defendant's beliefs were objectively reasonable. *Jeffries*, 164 Ill. 2d at 127-28, 646 N.E.2d at 598. If the State negates

any of the above elements, then the defendant's self-defense claim fails. *Jeffries*, 164 Ill. 2d at 128, 646 N.E.2d at 598.

¶ 39        In this case, the State did present evidence that negated defendant's self-defense claim. Battishill testified Robertson appeared to be walking away from the apartment until defendant yelled at him. After defendant yelled at him, Robertson approached defendant on the sidewalk. Battishill testified Robertson's arms were down at his side and he was slouched forward. According to Battishill, Robertson did not attempt to punch defendant or make any threatening or provoking gesture. Additionally, Battishill testified Robertson never attempted to reenter Battishill's apartment. Based on the aforementioned testimony, the State's evidence was sufficient for the jury to find beyond a reasonable doubt the State negated one or more of the elements of self-defense.

¶ 40        Defendant argues Battishill's testimony was fraught with inconsistencies, as he had told the police Robertson had swung at defendant on the sidewalk before defendant punched Robertson. The trial evidence did show Battishill told the police at the scene and at his initial interview at the police station that Robertson swung at defendant on the sidewalk. However, the evidence showed Battishill's written statement did not address the sidewalk incident at all and his recorded statement for Officer Rosendahl was similar to his trial testimony. Moreover, defendant did not even testify at trial that Robertson swung at him on the sidewalk. In support of his argument, defendant cites *People v. Smith*, 185 Ill. 2d 532, 545-46, 708 N.E.2d 365, 371 (1999), where our supreme court reversed the defendant's first degree murder conviction because the single eyewitness's testimony had serious inconsistencies and was repeatedly impeached. This case is distinguishable from *Smith* because defendant only points out one inconsistency in Battishill's statements and Battishill's trial testimony was consistent with defendant's trial

- 16 -

testimony. Accordingly, we do not find Battishill's testimony was so unsatisfactory as to create a reasonable doubt as to the jury's finding defendant did not act in self-defense. Thus, the State's evidence was sufficient for the jury to find defendant guilty beyond a reasonable doubt of aggravated battery (public way).

¶ 41                                    III. CONCLUSION

¶ 42            For the reasons stated, we reverse defendant's conviction and sentence for second degree murder and remand the cause to the Ford County circuit court for sentencing on defendant's conviction for aggravated battery (public way). As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

¶ 43            Reversed and remanded.