2024 IL App (1st) 240588

SECOND DIVISION
May 28, 2024

No. 1-24-0588B

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 24 CR 1597 |
| | ) | |
| JAMIE MILLER, | ) | Honorable |
| | ) | Maria Kuriakos-Ciesil, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court with opinion.
Presiding Justice Howse and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Jamie Miller, is charged with first degree murder based on allegations that he punched the victim once with a bare fist, and the victim subsequently died. On petition by the State, the trial court ordered that defendant be detained while awaiting trial. Defendant appeals that order.

¶ 2     The record shows that defendant was arrested on or about January 18, 2024, and charged with first degree murder in relation to the death of the victim, Andrew Hulburt. The record suggests that the case was first heard, and defendant was initially ordered detained, on January 20, 2024; however no orders, other documents, or transcripts related to that initial hearing appear in the record in this appeal.

¶ 3      Thereafter, on March 6, 2024, the State filed another petition for pretrial detention, and defense counsel filed a motion "to vacate detention order and release defendant from pretrial detention." In their respective filings, the State asserted that it would show, and defendant asserted that the evidence did not establish, the three requirements to detain him—specifically, that (1) the proof was evident or presumption great that defendant committed first degree murder; (2) he poses a threat to the safety of any person, persons or the community; and (3) no condition or combination of conditions could mitigate that risk.

¶ 4      The court held a hearing that same day. The assistant state's attorney (ASA) initially explained to the court that another trial judge had heard the case on January 20, 2024, and had granted the State's petition to detain. The court asked, "So this is for reconsideration? *** [I]t's really coming for a review, right, of her consideration?" Both parties agreed.

¶ 5      The ASA then proffered that the incident occurred on November 15, 2023, around 11:30 p.m., outside of the House of Blues, a concert venue, in Chicago. The victim, a 47-year old male, and another witness were walking out after a concert and encountered defendant along with another man handing out flyers for, what the ASA characterized as, a "fictitious after-school basketball program." The victim began yelling at defendant and the other man, and defendant asked the witness what was wrong with the victim. The witness told defendant that the victim was "simply intoxicated from alcohol." The witness and the victim started to walk away from the defendant "at which time the victim called the defendant a b***." Defendant then walked up behind the victim struck him "one time in the left temple with a closed fist." The victim fell backwards, and the back of his head struck the sidewalk. The entire incident was captured on surveillance video.

¶ 6      The victim was taken to the hospital and "declared deceased." An autopsy was conducted, and the medical examiner observed "a small bruise on the top of the victim's head, but no other

2

fractures or hematomas." The medical examiner determined the cause of death to be homicide from a "vertebral artery dissection." The ASA explained that the vertebral artery is a "fragile artery in the skull/head area and can dissect with a sudden head movement. The dissection caused the blood flow to stop to the brain," which caused the victim's death. When questioned by the court, the ASA stated that he was not sure if the medical examiner was able to determine whether the vertebral artery dissection was caused by defendant's strike or the victim's fall. The ASA did not currently have the medical examiner's report, and the ASA had not spoken with the medical examiner.

¶ 7    Defendant left the scene after the incident, and police observed his vehicle. Based on information obtained from the vehicle and license plate, police created a photo array with defendant's picture. The witness who was with the victim, and two other witnesses, positively identified defendant in the photo array.

¶ 8    As to defendant's criminal background, the State proffered that defendant had one felony retail theft conviction, for which he received two years of probation, which was terminated satisfactorily. The court asked the ASA if defendant had a juvenile background, and the State responded that he had three arrests—for robbery, attempted aggravated robbery, and theft—but the State did not know any "outcomes."

¶ 9    The court then turned to defense counsel, who disputed the ASA's characterization of the program that defendant was involved with as "fictitious," arguing that the State was incorrectly trying "to make it seem like he's there doing something unlawful." Defense counsel clarified that defendant was part of a violence prevention program and that he was standing outside the concert venue to collect money for that program.

¶ 10    Defense counsel further stated that the victim was "belligerent," and, in addition to calling defendant a "b***," the victim—a white man—called defendant—a black man—a racial slur.

¶ 11    Defense counsel argued that there was no clear and convincing evidence that defendant intended to kill or do great bodily harm to the victim to support the first degree murder charge. Defendant struck the victim once, and the victim "fell, that was the end of it. [Defendant] never tried to go back for more. He never tried to do great bodily harm or *** to kill anyone."

¶ 12    Defense counsel informed the trial court that there was a surveillance video of the incident, which had not been available on the previous court date. Counsel stated that the video showed defendant as "mild tempered. He struck someone and unfortunately that person died, but he never intended to *** do great bodily harm, or *** kill." The court viewed the surveillance video, which did not contain audio. The court agreed with defense counsel that defendant was not acting violent and was "mild tempered," before he encountered the victim.

¶ 13    Finally, defense counsel argued that defendant was not dangerous or a flight risk. Defendant was 29 years old and had one conviction for felony theft, but defendant did not have any violent background. Defendant counsel stated that defendant was "not a violent individual, there's nothing violent about him as an individual. *** He has four children that he provides for. He has a family that loves and supports him, as is evident in the courtroom today."

¶ 14    The court then asked the ASA if defendant had made any statements. The ASA responded that on January 18, 2024, two months after the incident, defendant spoke to police. Defendant was advised of, and waived, his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). During the interview, an officer told defendant that he was "at the station for a murder investigation," and defendant said something to the effect of, "he never killed anyone." Defendant also told the officer that he had never been to the House of Blues and that he was not there on the date of the incident.

¶ 15    The court then asked if any witnesses had made statements regarding what was said between the victim and defendant. The ASA responded that the witness who was with the victim told police that as they were walking away, the victim was still yelling. Defendant asked the victim "what [the victim] called [defendant]" and stated that the victim had used a racial slur. The witness responded that the victim did not.

¶ 16    Defense counsel then responded, asserting that it was understandable that defendant was scared after hearing that he was being investigated for murder and that, regardless of the witness's denial that the victim had uttered a racial slur, the witness's statement confirmed that defendant had heard one.

¶ 17    After arguments concluded, the court asserted that it had to "make a decision as to whether or not *** defendant's detention should continue." The judge at the prior hearing "heard the facts at the time the bond was set, and she determined based on the totality of the circumstances that this defendant should be detained. It's been brought in front of me for reconsideration." The court explained that the video showed "something [being] said" between the victim and defendant, the victim then walked off, and defendant came up on the victim from behind. Then, there was a "confrontation" during which there was a "stare down of sorts" and "something being said between the two." At that point, "it's the defendant who uses his fist to punch him."

¶ 18    The trial court agreed that "defendant's intention may not have been to kill" the victim. However, the court stated that "knowing that [defendant's] fist [wa]s going to connect with the victim," showed defendant's intent to "do bodily harm which resulted [in] great bodily harm." The court further stated that "when you assault or batter another human being, you're taking them for what they are. So if this victim is the thin skulled eggshell victim, that's what the defendant was faced with, and the law does not require the defendant to have that previous knowledge."

¶ 19    As for defendant's background, the court acknowledged that his prior conviction was nonviolent, but stated that his juvenile background included " a robbery arrest and an attempt[ed] robbery arrest" which showed that defendant did not have "completely clean hands." Looking at "the totality of everything," the court found that "defendant needs to be detained for purposes of trial." The court explained that it agreed with the prior judge's findings that defendant be detained. The court commented that the prior judge had not seen the video, and "in that video, it looks like something between two men that turned from words to defendant resorting to *** violence."

¶ 20    That same day, the court entered a written order to detain defendant. The court found that the proof was evident or the presumption great that defendant committed the detainable offense of first degree murder. The trial court wrote that "defendant followed the victim, after words were exchanged, and punched victim once; the artery to the brain was damaged which resulted in lack of blood flow to the brain." The court also found that defendant posed a real and present threat to the safety of any person or persons of the community, based on the specific articulable facts of the case, writing:

> "words led to the defendant following the victim and punching him. The defendant had one felony conviction for retail theft. The defendant denied being at the scene after being arrested. The video captured the incident. The defendant was at the scene passing out fliers for an Anti-Violence Organization when this incident happened."

¶ 21    Finally, the court found that no conditions or combination of conditions could mitigate the safety threat because "the nature of the charge, the defendant's background, and the defendant's denial overcame the mitigation that he was 24 [*sic*] years old, and had no violent felony background. The defendant did have juvenile arrests for robbery and attempted armed robbery."

¶ 22    Defendant filed a timely notice of appeal on March 6, 2024, requesting the reversal of the trial court's order denying pretrial release. Utilizing the form approved for Illinois Supreme Court Rule 604(h) (eff. Dec. 7, 2023) appeals by defendants, defense counsel checked four boxes, asserting that (1) the State failed to meet its burden of proving by clear and convincing evidence that the proof is evident or the presumption great that defendant committed the offense(s) charged; (2) the State failed to meet its burden of proving by clear and convincing evidence that defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific, articulable facts of the case; (3) the State failed to meet its burden of proving by clear and convincing evidence that no condition or combination of conditions can mitigate the real and present threat to the safety of any person or persons or the community; and (4) the court erred in its determination that no condition or combination of conditions would reasonably ensure the appearance of defendant for later hearings of prevent defendant from being charged with a subsequent felony or Class A misdemeanor.

¶ 23    The appeal is brought pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), as amended by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act (Act), which amended the Code by abolishing traditional monetary bail in favor of pretrial release on personal recognizance or with conditions of release (725 ILCS 5/110-1.5, 110-2(a) (West 2022)). See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date of Act as September 18, 2023). This court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 604(h) (eff. Dec. 7, 2023).

¶ 24    Under the Code, all persons charged with an offense are eligible for pretrial release before conviction. 725 ILCS 5/110-2 (West 2022). A defendant is presumptively entitled to be released before trial, and the State bears the burden to prove otherwise. *Id.* ("[i]t is presumed that a defendant is entitled to release on personal recognizance," subject to certain universal conditions). The court may deny pretrial release upon a verified petition by the State and following a hearing. *Id.* § 110-6.1(a). At that hearing, it is the State's burden to prove by clear and convincing evidence that (1) the presumption is great or the proof evident that the defendant committed a detainable offense, (2) the defendant poses a real and present threat to the safety of any person(s) or the community, based on the specific and articulable facts of the case, and (3) no condition or combination of conditions can mitigate the threat the defendant poses, or prevent the defendant's willful flight from prosecution. *Id.* § 110-6.1(e)(1)-(3). The standard "requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt." *In re D.T.*, 212 Ill. 2d 347, 362 (2004).

¶ 25    In this court, defendant filed a Rule 604(h) memorandum, expanding on the first two claims of error. Specifically, defendant first contends that the State failed to meet its burden of proving by clear and convincing evidence that the proof is evident or the presumption great that defendant committed first degree murder because there was no evidence in the State's proffer

> "that would have proven or contributed to its allegation that [defendant] knew his actions would create a strong probability of death or great bodily harm. The same medical examiner proffered by the State even provided that there were no fractures or hematomas on [the victim's] head, just 'one small bruise.' "

Defendant asserts that hitting the victim once with his bare fist does not show that he knew his acts created a "strong probability of death or great bodily harm. The State did not argue or introduce

8

any external factors that would explain why a single punch could amount to first degree murder because there are no additional factors that could contribute to [defendant]'s *mens rea*."

¶ 26    Defendant also contends that the court erred in finding that he poses a safety threat. He acknowledges that he has one prior conviction but asserts that it was for a nonviolent offense and that he successfully completed his probation in 2022. Defendant further alleges that the proffered facts showed that defendant was interacting with other patrons outside of the concert venue without incident, prior to encountering the victim. The witness who was with the victim confirmed that the victim was drunk and yelling at defendant before the incident, and defendant asserts that he punched the victim only after the victim shouted a racial slur at him.

¶ 27    The applicable standard of review in a pretrial detention appeal has been the source of considerable disagreement in the Illinois Appellate Court. Some appellate decisions have concluded that all aspects of detention hearings under the Act are subject to abuse of discretion (see *People v. Whitmore*, 2023 IL App (1st) 231807, ¶¶ 18-19; *People v. Inman*, 2023 IL App (4th) 230864, ¶ 11) while others have exclusively utilized the manifest weight of the evidence standard (see *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12; *People v. Rodriguez*, 2023 IL App (3d) 230450, ¶ 8). Other courts have adopted a mixed approach, under which the circuit court's determinations that the State has proved by "clear and convincing evidence" that the defendant committed a qualifying offense, and that he is dangerous, is reviewed for the manifest weight of the evidence, while the ultimate decision regarding detention, or the imposition of conditions of release are subject to abuse of discretion review. See *People v. Parker*, 2024 IL App (1st) 232164, ¶¶ 48-50; *People v. Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36; *People v. Hodge*, 2024 IL App (3d) 230543, ¶ 8; *People v. Vingara*, 2023 IL App (5th) 230698, ¶ 10; *People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 24, 31. One justice has

9

endorsed a *de novo* standard, at least when the circuit court hears no live testimony and relies solely on documentary evidence. *Saucedo*, 2024 IL App (1st) 232020, ¶ 122 (Ellis, J., specially concurring).

¶ 28    We agree with those cases that have applied a mixed approach and believe that the circuit court's determinations that the State has proved by "clear and convincing evidence" that the defendant committed a qualifying offense, or that defendant is dangerous, should be reviewed for the manifest weight of the evidence. See *id.* ¶¶ 31-36 (majority opinion); *Parker*, 2024 IL App (1st) 232164, ¶¶ 48-50.

¶ 29    Before turning to defendant's challenges on appeal, we note that the record shows some confusion by the court and parties in whether the hearing that was conducted was one in which the trial court was required to make the three findings set forth above under section 110-6.1(e) of the Code (725 ILCS 5/110-6.1(e) (West 2022)), or if the court was merely reviewing or reconsidering the prior detention order. The State filed petition to detain under section 110-6.1, and the defense filed a motion to vacate the detention order, also under section 110-6.1. During the hearing, the court commented that the matter was before the court "for reconsideration," and the court ultimately "agree[d] with the prior judge's findings that defendant be detained." However, the written order entered following the hearing tracked the language of section 110-6.1(e), and the court made the three required detention findings under that section.

¶ 30    Ordinarily, a court holds a pretrial detention hearing "[u]pon verified petition by the State," at the first appearance before a judge, or within 21 calendar days (*id.* § 110-6.1(a), (c)(1)), at which time, it is the State's burden to prove by clear and convincing evidence of the three findings set forth above. At each subsequent court appearance thereafter, the court is required to assess whether "continued detention is necessary to avoid a real and present threat to the safety of any person or

10

persons or the community, based on the specific articulable facts of the case, or to prevent the defendant's willful flight from prosecution." *Id.* § 110-6.1(i-5).

¶ 31    Although the hearing conducted in this case occurred after an initial detention order, both parties sought—and the trial court made—findings under section 110-6.1(e). Moreover, in this court, the State has made no argument that such findings were not required, and the parties continue to couch their arguments in the language of section 110-6.1(e). We also note that there is nothing in the record of this appeal from the earlier hearing. In these circumstances, where the parties and the trial court treated the hearing as one in which findings under section 110-6.1(e) were required, we will do so as well.

¶ 32    Turning to defendant's arguments on appeal, defendant first contends that the State failed to meet its burden of showing clear and convincing evidence that the proof is evident or presumption great that he committed the detainable offense of first degree murder. Defendant contends that his actions in punching the victim once do not support a conclusion that he knew those actions would create a strong probability of death or great bodily harm. Defendant also points to the findings of the medical examiner, proffered by the State, that the victim had only "one small bruise."

¶ 33    In the State's memorandum, it asserts that defendant "essentially argues that it is impossible to intend great bodily harm with one punch under Illinois law." The State contends that this is "not accurate" because, in *People v. DiVincenzo*, 183 Ill. 2d 239, 254 (1998), our supreme court held that "[a]n individual who kills another by punching and kicking can be convicted of first degree murder if he acts with the requisite mental state." The State maintains that it adequately showed clear and convincing evidence of defendant's *mens rea*, where the evidence showed that

11

defendant "hit the victim in his left temple, the victim fell and hit his head on the sidewalk and died of a vertebral artery dissection."

¶ 34    In Illinois, the offense of first degree murder is set forth in section 9-1(a) of the Criminal Code of 2012 (720 ILCS 5/9-1(a) (West 2022)), which provides:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> (1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>
> (2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another; or
>
> (3) he or she, acting alone or with one or more participants, commits or attempts to commit a forcible felony other than second degree murder, and in the course of or in furtherance of such crime or flight therefrom, he or she or another participant causes the death of a person."

¶ 35    First degree murder is a single offense, and "the different theories embodied in the first degree murder statute [citation] are merely different ways to commit the same crime." (Internal quotation marks omitted.) *People v. Smith*, 233 Ill. 2d 1, 16 (2009). "In other words, 'subsections (a)(1), (a)(2), and (a)(3) of section 9-1 of the Criminal Code, defining intentional murder, knowing murder[,] and felony murder, delineate only the mental state or conduct that must accompany the acts that cause a death.' " *Id.* (quoting *People v. Daniels*, 187 Ill. 2d 301, 313 (1999)).

¶ 36    In this case, the charging document does not appear in the record on appeal, and it is not entirely clear whether defendant was charged under subsection (a)(1), (a)(2), or both. Both the

court and the parties spoke interchangeably about whether defendant intended to kill or do great bodily harm and whether he knew that his actions created a strong probability of death or great bodily harm. Accordingly, we will consider defendant's argument as to whether the State showed that there was clear and convincing evidence that defendant committed first degree murder under either subsection (a)(1) or (a)(2).

¶ 37    As noted above, a person is guilty of "intentional murder" under subsection (a)(1) when he either intends to kill or do great bodily harm to that individual or another or knows that such acts will cause death to that individual or another. 720 ILCS 5/9-1(a)(1) (West 2022). Likewise, subsection (a)(2) provides that a person is guilty of the offense of first degree murder when he kills an individual without lawful justification, if, in performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm to that individual or another. *Id.* § 9-1(a)(2). A person acts with "intent" when "when his conscious objective or purpose is to accomplish that result or engage in that conduct" (*id.* § 4-4), whereas a person acts with knowledge "when he or she is consciously aware that that result is practically certain to be caused by his conduct" (*id.* § 4-5(b)). See *People v. Jones*, 404 Ill. App. 3d 734, 742 (2010) ("A person is said to have knowledge when he is consciously aware that his conduct is practically certain to cause a particular result."); *People v. Leach*, 405 Ill. App. 3d 297, 312 (2010).

¶ 38    In finding that the proof was evident or presumption great that defendant committed first degree murder, the trial court commented that, by punching the victim, the defendant intended to "do bodily harm" which then "resulted [in] great bodily harm." To sustain a conviction for intentional murder, however, a defendant must "intend[ ] to kill or do great bodily harm," and not just intend to cause some harm that resulted in a greater injury than intended. 720 ILCS 5/4-4, 9-1(a)(1) (West 2022). The court also commented that defendant "kn[e]w[ ] that [his] fist [wa]s going

13

to connect with the victim"; however, such knowledge is also insufficient to show that defendant knew the punch "create[d] a strong probability of death or great bodily harm"—*i.e.*, that defendant was consciously aware that death was "practically certain to be caused by" the punch—in order to sustain a conviction for knowing murder. *Id.* §§ 4-5(b), 9-1(a)(2). A defendant must act with the requisite *mens rea* to support a first degree murder conviction, and the court's comments reflect a misunderstanding of the requirements for intentional and knowing murder in Illinois.

¶ 39 There is a long-standing general rule in Illinois that death is not ordinarily contemplated as a natural consequence of a blow or blows from a bare fist. In *People v. Crenshaw*, 298 Ill. 412, 414 (1921), our supreme court considered a case in which the defendant sought out the victim, told him that he would kill him, then struck the victim in the face with a clenched fist, knocking the victim down. The victim died shortly thereafter, as a result of the defendant's blow. *Id.* Despite the defendant's statement, the supreme court reversed his murder conviction, finding that "striking of a blow with the fist on the side of the face or head is not likely to be attended with dangerous or fatal consequences, and no inference of an intent to kill is warranted from the circumstances disclosed by the proof in this case." *Id.* at 416-17; see *People v. Mighell*, 254 Ill. 53, 59 (1912) (reversing a defendant's murder conviction where the defendant punched the victim in the neck with a bare fist, fracturing the base of the victim's skull and causing a hemorrhage in the victim's carotid artery: "[T]he defendant was guilty of no more than manslaughter, and he should not, therefore, have been convicted of murder. *** There is not the slightest reason *** to suppose that he contemplated the [deceased's] death or even any serious injury to him.").

¶ 40 Since that time, courts in this state have repeatedly confirmed the general rule that death is not ordinarily contemplated as a natural consequence of blows from a bare fist. *People v. Gresham*, 78 Ill. App. 3d 1003, 1007 (1979) ("death is not a reasonable or probable consequence of a blow

14

with a bare fist"); *People v. Nibbe*, 2016 IL App (4th) 140363, ¶ 34 (reversing a defendant's second degree murder conviction where the defendant punched the victim once or twice in the face with a bare fist); *People v. Yeoman*, 2016 IL App (3d) 140324, ¶ 22 ("[T]here is no dispute in this case that defendant struck [the victim] only one time in the face with his bare fist. That conduct alone is not the type of conduct that would generally create a strong probability of death or great bodily harm to the victim. [Citation.] Defendant, therefore, could not have knowledge that such a result was practically certain to occur.").

¶ 41 Illinois courts have, however, recognized some exceptions to that general principle. In particular, in *People v. Ward*, 101 Ill. 2d 443, 451-52 (1984), our supreme court affirmed the murder conviction of an adult defendant for the beating death of a four-year-old child, recognizing that a blow from a bare fist could result in murder where there was a great disparity in size and strength between the defendant and the victim. See *People v. Brackett*, 117 Ill. 2d 170, 180-81 (1987) (affirming the murder conviction of a 21-year-old defendant for the barehanded beating death of an 85-year-old woman); *People v. Drumheller*, 15 Ill. App. 3d 418, 421 (1973) (affirming the murder conviction of an adult defendant in the beating death of a 14-month-old infant). Another exception to the general rule has been applied where the defendant inflicted multiple blows to the victim. See *People v. Rodgers*, 254 Ill. App. 3d 148, 151-54 (1993), *vacated on other grounds*, 156 Ill. 2d 564 (1994) (supervisory order), *readopted in pertinent part*, 265 Ill. App. 3d 1, 2 (1994) (affirming the defendant's murder conviction where the defendant punched the victim in the head numerous times while the victim was sleeping).

¶ 42 The findings made by the trial court to support its conclusion that the proof was evident or presumption great that defendant committed the offense do not suggest that defendant possessed the requisite *mens rea* to support a first degree murder charge. Specifically, the court wrote only

15

that "defendant followed the victim, after words were exchanged, and punched victim once; the artery to the brain was damaged which resulted in lack of blood flow to the brain." Without more, such findings do not indicate how defendant could have known that his single bare fisted punch would have caused death or great bodily harm to the victim, to support a conviction for first degree murder.

¶ 43    Although the surveillance video is not included in the record on appeal, the trial court's description of that video does not appear to suggest that an exception could be applicable. The court described the video as showing a "confrontation," during which there was a "stare down of sorts" and "something being said between" defendant and the victim, before defendant "uses his fist to punch" the victim. Based on this description, and this court's review of the record on appeal, we find no evidence suggesting that defendant's bare fisted single punch could fit under any exception to the general rule. The facts proffered to the court established that defendant struck the victim with his bare fist once and not multiple times. And, the facts showed that defendant and the victim were aged, respectively, 29 and 47—far from the type of significant age gap that would suggest, without further information, that there was a size or strength discrepancy like those which have implicated the exception in other cases. See *Ward*, 101 Ill. 2d at 446-52 (adult defendant and a four-year-old victim); *Brackett*, 117 Ill. 2d at 180-81 (21-year-old defendant and 85-year-old victim); *Drumheller*, 15 Ill. App. 3d at 421 (adult defendant and 14-month-old infant victim).

¶ 44    The State, however, cites *DiVincenzo*, 183 Ill. 2d at 254, to contend that our supreme court has instructed "punching and kicking" can sustain a first degree murder conviction. *DiVincenzo* is distinguishable from this case and illustrates the inapplicability of the offense under the facts proffered here.

¶ 45    In *DiVincenzo*, the defendant testified at trial, acknowledging that he struck the victim twice in the face, including a punch that knocked the victim to the ground. *Id.* at 245. An eyewitness also testified that she saw the altercation between defendant and victim, and after the victim fell to the ground, defendant kicked the victim three times—once in the head—while the victim was lying motionless on the ground. *Id.* at 246. The medical examiner testified that the victim had two bruises on his back and one on his head. *Id.* at 247. On appeal, the supreme found that the record contained evidence that supported the conclusion that the defendant acted only recklessly and that the trial court had improperly refused to issue an involuntary manslaughter instruction. *Id.* at 251. In particular, the "short duration" of the beating and expert testimony that the injury that resulted in the victim's death was a "rare phenomenon," supported a finding of recklessness, rather than knowledge that the defendant's acts created a strong probability of death or great bodily harm. *Id.* However, the supreme court rejected the defendant's request to outright reverse his first degree murder conviction and remanded the matter for a new trial, finding that the evidence, viewed in the light most favorable to the State, had been sufficient to support the conviction. *Id.* at 253-54. In particular, the court explained that a jury could have reasonably inferred that the defendant acted with the knowledge that his multiple punches and kicks created a strong probability of death or great bodily harm. *Id.*

¶ 46    While the court in *DiVincenzo* found that "inferences as to defendant's mental state are a matter particularly within the province of the jury" and that such questions should be answered "by the trier of fact at a new trial" (*id.*), the proffered facts here are far different from those offered in that case. Here, the evidence shows that defendant struck the victim with his bare fist only once. Defendant did not punch and kick the victim multiple times, nor did he continue to attack the victim after he fell to the ground. Accordingly, we do not find that *DiVincenzo* supports the

17

conclusion that the proof is evident or presumption great that defendant committed first degree murder under the facts presented here.

¶ 47    We also observe that the parties appear to dispute where defendant's punch landed—the defense asserts that defendant punched the victim in the jaw, while the State contends that defendant punched him in the left temple. Nonetheless, the State's proffer indicated that the medical examiner observed only "a small bruise" on the victim's head, and that the victim died of a "vertebral artery dissection." The ASA explained that vertebral artery is "fragile" and dissection causes "blood flow to stop to the brain" after a "sudden head movement." Notably, the ASA did not have the medical examiner's report and had not spoken with the medical examiner, and the ASA did not know if the medical examiner had determined whether the dissection was caused by defendant's strike or the fall. The absence of any medical examiner's report or any evidence as to the cause of the victim's vertebral artery dissection provides additional doubt that defendant intended to kill or do great bodily harm by his single punch, to support a first degree murder charge. See *Nibbe*, 2016 IL App (4th) 140363, ¶ 34 (reversing defendant's second degree murder conviction, observing that the victim had died from his head striking the concrete and not from the blow to the face, and "the evidence did not show a strong probability [the victim] would fall and strike his head on the concrete with the force that it did").

¶ 48    Finally, we note that the court also appeared to place some weight on defendant's "denial" in which he stated that he had never killed anyone. This statement, however, could easily be interpreted as accurate. The proffer shows that defendant punched the victim once, and there is no evidence which would suggest that defendant was aware that his punch to the victim caused the victim's death.

18

¶ 49　We next turn to defendant's contention that the facts proffered to the court do not support the trial court's finding that he is dangerous. In determining whether the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, the legislature has set out a number of factors that the court may consider. Those factors include the "nature and circumstances of any offense charged," including whether the offense involves a weapon; the "history and characteristics of the defendant," including "prior criminal history indicative of violent, abusive or assaultive behavior"; whether the defendant "is known to possess or have access to any weapon or weapons"; whether at the time of the current offense, "the defendant was on probation, parole, aftercare release, mandatory supervised release or other release from custody pending trial, sentencing, appeal or completion of sentence for an offense under federal or state law"; and any "other factors *** deemed by the court to have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior." 725 ILCS 5/110-6.1(g) (West 2022).

¶ 50　Defendant contends that the record does not support a finding that he is dangerous where he does not have any convictions for violent offenses and he has strong community ties, including children who he supports. Defendant also contends that the nature and circumstances of the offense show that the victim acted aggressive toward defendant and used a racial slur, before the defendant punched the victim once.

¶ 51　The State responds that the trial court's finding that defendant posed a safety threat should be affirmed because two factors—specifically, "the nature and circumstances of the offense charged," and the "nature and seriousness of the threat defendant's release would pose to the safety of the community"—weigh in favor of finding defendant dangerous. In particular, the State contends that "the nature and circumstances of the offense charged" show that he is dangerous

because he is charged with murder, "which goes without saying is the most violent and hence most dangerous crime a person could ever commit." The State further asserts that the "nature and seriousness of the threat defendant's release would pose" shows he is a danger because, "again, defendant has already committed a murder," and he "did so solely because of an insult."

¶ 52    Where, however, this court has expressed doubt about the propriety of a first degree murder charge under the proffered facts, we find the State's argument that he is dangerous simply because he has been charged with that offense, to be unpersuasive. We also observe that the State does not argue that any other factor weighs in favor of finding him dangerous. Indeed, defendant does not have a criminal history "indicative of violent *** behavior," he was not on probation, parole, or any other type of release at the time of the offense, there no evidence that he "possesses or has access to weapons," and there is no other evidence showing that defendant has a "propensity or reputation for violent, abusive, or assaultive behavior." We reiterate that under the Act, "[a]ll persons charged with an offense shall be eligible for pretrial release before conviction" and a defendant is presumptively entitled to be released before trial. *Id.* § 110-2(a).

¶ 53    In sum, because the record suggests that the court was unaware of the legal principles set forth above and applied an incorrect legal standard in evaluating the proffered facts, we remand this matter to the trial court to consider whether defendant should be entitled to pretrial release in light of the law described above.

¶ 54    For the foregoing reasons, this matter is remanded for additional proceedings consistent with this opinion.

¶ 55    Reversed and remanded.

***People v. Miller*, 2024 IL App (1st) 240588**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 24-CR-1597; the Hon. Maria Kuriakos-Ciesil, Judge, presiding. |
| **Attorneys for Appellant:** | Ari Williams, of Ari Williams Law, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Noah Montague, Assistant State's Attorney, of counsel), for the People. |